SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A—002540-18

DAVIDA SCHUMAN                      :

    Plaintiff-Appellant          :                CIVIL ACTION

           v.              :     ON APPEAL FROM A FINAL AGENCY
                             DECISION BY CIVIL SERV. COMMN

CIVIL SERVICE COMMISSION            :         Sat Below:

    Defendant-Appellee           :     CIVIL SERVICE COMMISSION

---

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A—002878-18

DAVIDA SCHUMAN                      :

    Plaintiff-Appellant          :                CIVIL ACTION

           v.              :     ON APPEAL FROM A FINAL AGENCY
                             DECISION BY KEAN UNIVERSITY

KEAN UNIVERSITY                     :         Sat Below:

    Defendant-Appellee           :         KEAN UNIVERSITY

---

**APPELLANT'S BRIEF AND APPENDIX ON APPEAL**

---

WILLIAMS CEDAR LLC
8 Kings Highway West, Suite B
Haddonfield, New Jersey 08033
(856) 470-9777 (Tel)
Khaverty@williamscedar.com

*Attorneys for*
*Appellant Davida Schuman*

Kevin Haverty
*On the Brief*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................iii

TABLE OF APPENDIX.............................................xi

PRELIMINARY STATEMENT.........................................1

STATEMENT OF PROCEDURAL HISTORY...............................3

STATEMENT OF FACTS............................................6

LEGAL ARGUMENT...............................................16

### POINT I

THE POLICY IS FACIALLY UNCONTSITUTIONAL, AND UNCONSTITUTIONAL AS APPLIED TO DR. SCHUMAN, UNDER BOTH THE UNITED STATES AND NEW JERSEY CONSTITUTIONS (This issue was not addressed below)...........................16

A. The Policy Is Facially Unconstitutional Because It Is Neither Content Nor Viewpoint Neutral...........17

B. The Policy Is Unconstitutionally Vague And Overbroad...............................................34

C. The Policy Is So Permeated With Content/Viewpoint, Vagueness And Overbreadth Problems That It Is Not Salvageable........................................38

D. Dr. Schuman Did Not Discriminate Against Dr. Tracey....40

### POINT II

SINCE THE NEW JERSEY POLICY IS UNCONSTITUTIONAL, THE COURT SHOULD RESCIND ALL DISCIPLINARY ACTIONS RELATED TO THE CHARGE THAT SHE VIOLATED THE POLICY (This issue was not addressed below).....................................42

A. All Disciplinary Actions For Purportedly Violating The Policy Must Be Rescinded Pursuant to 42 U.S.C. §1983, Since They Violated Her Free Speech And Due Process Rights................................42

B. The Non-Teaching Assignment Constituted A Disciplinary Action And Was Imposed Based On the

i

Claim That Dr. Schuman Had Violated The Policy And Must Accordingly Be Rescinded..........................50

C. If The Non-Teaching Assignment Was Not Related To The Alleged Violation Of The Policy, Then It Violated Dr. Schuman's Liberty Interest And Procedural And Substantive Due Process Rights........................58

D. Imposing The Non-Teaching Assignment Without Charges Or A Hearing Violated The New Jersey Teacher Tenure Act...........................................69

## POINT III

THE COMMISSION'S POSITION THAT IT DOES NOT HAVE JURISDICTION OVER DR. SCHUMAN'S APPEAL IS INCONSISTENT WITH THE LANGUAGE OF THE POLICY, CONTRARY TO PROVISIONS IN THE NEW JERSEY CIVIL SERVICE ACT, AND VIOLATES EQUAL PROTECTION (Part of this claim, relating to the language of the Policy, was raised below)..........................72

A. Under The Express Terms Of N.J.A.C. 4A:7-3.2(n), Dr. Schuman Was Entitled To Appeal To The Commission.........................................74

B. The Determination The Commission Did Not Have Jurisdiction To Hear The Appeal Violated Equal Protection............................................83

## POINT IV

IN THE INTEREST OF JUDICIAL ECONOMY, THE COURT SHOULD ASSERT ORIGINAL JURISDICTION OVER THIS APPEAL PURSUANT TO R. 2:10-5. (This issue was not addressed below.).......90

CONCLUSION....................................................97

TABLE OF AUTHORITIES

CASES

A.B. v. Div. of Med. Assistance, 407 N.J. Super. 330
(App. Div. 2009 ..............................................72

Abrahams v. Civil Serv. Comm'n, 65 N.J. 61 (1974)..............92

Abramson v. William Patterson College of N.J.,
260 F.3d 265 (3d Cir. 2001)................................40,41

Affiliated Distillers Brand Corp. v. Sills,
60 N.J. 342 (1972).............................................39

Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974)........61,72

Arsenault v. Gavin, 248 F.2d 777 (1st Cir. 1957) ...............84

Bagget v. Bullitt, 377 U.S. 360 (1964)........................34

Bass v. Bd. of County Commissioners, 256 F.3d 1095
(11th Cir. 2001) ..........................................53,54

Beaver v. Magellan Health Servs., Inc., 433 N.J. Super. 430
(App. Div. 2013)...............................................93

Bednar v. Westwood Bd. of Educ., 221 N.J. Super. 239
(App. Div. 1987)...............................................69

Bd. of Regents v. Roth, 408 U.S. 564 (1972)................58,59

Bence v. Breier, 501 F.2d 1185 (7th Cir. 1974) ................48

Broadrick v. Oklahoma, 413 U.S. 601 (1973)....................36

Christian Bros. Inst. V. No. N.J. Interschol. League,
86 N.J. 409 (1989).............................................95

Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432 (1985)
473 U.S. 432 (1985)............................................84

Cleveland Bd. of Educ. V. Loudermill, 470 U.S. 532 (1985)...16,42

College Republicans at San Francisco State Univ. v. Reed,
523 F. Supp. 2d 1005 (N.D. Cal. 2007).......................23,37

CASES (cont'd)

Conrad v. Pennsylvania State Police, 902 F.3d 178
(3rd Cir 2018) ...............................................53

Constantino v. New Jersey Merit Syst. Bd., 313 N.J. Super. 212
(App. Div. 1998)...........................................89

Coursey v. City of Atl. City, 2013 WL 5676851
(App. Div. Oct. 21, 2013)..................................92

Cutler v. Dorn, 196 N.J. 419 (2008)..........................40

Danbrot v. Central Mich. Univ., 55 F.3d 1177 (6th Cir 1995) ....23

Dejohn v. Temple Univ., 537 F.3d 301 (3rd Cir. 2008) .....23,28,37

Director, Office of Workers Compensation Programs v. Mangifest,
826 F.2d 1318 (3rd Cir. 1987) .................................78

Dixon v. Rutgers, The State University of N.J.,
110 N.J. 432 (1988)..........................................7

Doe v. Univ. of Mich., 721 F. Supp. 1163 (E.D. Mich. 1989)..23,37

Donaldson v. Bd. of Educ. of No. Wildwood, 65 N.J. 236 (1974)..65

Faragher v. City of Boca Raton, 524 U.S. 775 (1998)...........41

Fine v. Galloway Tp. Committee, 190 N.J. Super. 432
(App. Div. 1983)...........................................73

Fuchilla v. Layman, 109 N.J. 319 (1988).......................17

Gitlow v. People of State of New York, 268 U.S. 652 (1925).....16

Greenberg v. Kimmelman, 95 N.J. 552 (1985)....................44

Griffin v. Illinois, 351 U.S. 12 (1956).......................85

Goss v. Lopez, 419 U.S. 565 (1975)............................63

Hamtramck Civil Serv. Comm'n v. Pitlock, 205 N.W.2d 293
(Mich. 1973)...............................................49

Hansen v. Bd. of Educ., 502 N.E. 2d 467 (Ill. Ct. App. 1986)...70

CASES (cont'd)

Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246 (1994)........61

Head v. Chicago Sch. Reform Bd., Trustees, 225 F.3d 794
(7th Cir. 2000) .............................................56

Hughes v. Witmer, 714 F.2d 1407 (8th Cir. 1983), cert. denied,
465 U.S. 1023 (1984).........................................57

In re Adoption of N.J.A.C. 5.96 and 5.97, 215 N.J. 578 (2013)..39

In re Hearn, 417 N.J. Super. 289 (App. Div. 2010)...........79-82

In the Matter of J.L., 2016 WL 512431
(App. Div. Feb. 10, 2016).....................................87

In the Matter of T.M., 2013 WL 2301090
(App. Div. May 28, 2013)......................................89

IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.,
993 F.2d 386 (4th Cir. 1993) .................................23

Jean v. Deflaminis, 480 F.3d 259 (3rd Cir. 2007) .............52

John Doe v. Poritz, 142 N.J. 1 (1995)........................64

Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123 (1951)...61

Knight v. City, Hoboken Rent Leveling,
332 N.J. Super. (App. Div. 2000).............................39

Kolender v. Lawson, 461 U.S. 352 (1983)......................34

Konop v. Rosen, 425 N.J. Super. 391 (App. Div. 2012)..........89

Levin v. Harleston, 966 F.2d 85 (2nd Cir. 1991) ..............56

Lewis v. Harris, 188 N.J. 415 (2006).........................86

Lindsey v. Normet, 405 U.S. 56 (1972)........................84

Love-Lane v. Martin, 355 F.3d 766 (4th Cir. 2004) ...........56

Lower Main Street Assocs. V. N.J. Housing & Mortg.
Finance Agency, 114 N.J. 226 (1989)..........................74

CASES (cont'd)

Maisonet v. New Jersey Dept. of Human Servs.,
140 N.J. 214 (1995)........................................93-96

Marra v. Phila. Housing, 497 F.3d 286 (3rd Cir. 2007) ..........53

Matter of Judges of Passaic County, 100 N.J. 352 (1985).......95

Matter of N.J.A.C. 14A:20-11, 216 N.J. Super. 297
(App. Div. 1987)............................................74

Matter of Wolf, 231 N.J. Super. 365 (App. Div. 1989)..........89

McCauley v. Univ. of Virgin Islands, 618 F.3d 232
(3rd Cir. 2010) .............................................37

Memphis Community Sch. Dist. v. Stachura,
477 U.S. 299 (1986).......................................16,42

Minter v. Bendix Aviation Corp., 24 N.J. 128 (1957)...........96

Mitchell v. Bd. of Trustees, 42 P.2d 397 (Cal. Ct. App. 1935)..71

Mullane v. Central Hanover Tr. Co., 339 U.S. 306 (1950).....44,47

Mt. Healthy City Bd. of Educ. V. Doyle, 428 U.S. 274 (1977)....52

Mutschler v. New Jersey Dept. of Environmental Protection,
337 N.J. Super. 1 (App. Div. 2001)...........................93

New Jersey Div. of Youth & Family Svcs. v. M.R.
314 N.J. Super. 390 (App. Div. 1998).........................7

Ng v. State Personnel Bd., 68 Cal. App. 3d 600
(Cal. Ct. App. 1977)........................................71

Nicoletta v. No. Jersey Dist. Water Supply Comm'n
77 N.J. 145 (1978)......................................16,42,47

Navato v. Sletten, 560 F.2d 340 (8th Cir. 1977) ...............47

Patterson  Redevelopment Agency v. Schulman,
78 N.J. 378 (1979).......................................91,93

Peper v. Princeton University Board of Trustees,
77. N.J. 55 (1978)..........................................86

CASES (cont'd)

Perry Educ. Assn. v. Perry Local Educators' Assn.,
460 U.S. 37 (1983)............................................18

Planet Aid v. City of St. Johns, 782 F.3d 318 (6th Cir. 2015) ..18

Rabinowitz v. Pena, 89 F.3d 482 (7th Cir. 1996) ................40

R.A.V. v. St. Paul, 505 U.S. 377 (1992)..................19-21,30

Reisman v. Great American Recreation, 266 N.J. Super. 87
(App. Div. 1993)..............................................73

Right to Choose v. Byrne, ..................................39,86

Rinaldi v. Yeager, 384 U.S. 305 (1977).........................85

Roberts v. Haragan, 346 F. Supp. 2d 853 (N.D. Tex. 2004)....23,37

Robinson v. Cahill, 62 N.J. 473 (1973) ....................... 86

Rogers v. Alternative Resources Corp., 440 F. Supp. 2d 366
(D.N.J. 2006).................................................53

Romano v. Brown & Williamson Tobacco, 284 N.J. Super. 543
(App. Div. 1995)..............................................52

Russo v. Bd. Of Trustees, Police and Firemen's Retirement Syst.,
206 N.J. 14 (2011)............................................74

Rutan v. Republican Party of Illinois, 868 F2d 943 (7th Cir. 1989)
..............................................................57

Salerno v. O'Rourke, 555 F. Supp. 750 (D.N.J. 1983)........66-68

San Antonio Independent School District v. Rodriguez,
411 U.S. 1 (1973).............................................86

Saxe v. State College Area Sch. Dist., 230 F.3d 200
(3rd Cir. 2001) .........................................23-28,32

Setterlund v. Groton-Dunstable Reg'l Sch. Comm'n, 415 N.E. 2d 214
(Mass. 1981)..................................................71

Sharp v. City of Houston, 164 F.3d 923 (5th Cir. 1999) ........56

CASES (cont'd)

Sharp v. Kean Univ., 2014 WL 6908775 (D.N.J. Dec. 8, 2014).....17

Silviera-Francesco v. Bd. of Educ. of Elizabeth,
224 N.J. 126 (2016)...........................................93

Smock v. Bd. of Regents, 353 F. Supp. 3d 651
(E.D. Mich. 2018)..........................................61-63

Sponick v. City of Detroit Police Dept., 211 N.W.2d 674
(Mich. 1973)..................................................49

State v. Butler, 89 N.J. 220 (1982)...........................73

State v. Rose, 173 N.J. Super. 478 (App. Div. 1980).........96,97

State v. Schmid, 84 N.J. 535 (1985).........................22,39

State v. Vawter, 136 N.J. 56 (1994).........................22,30

Sypniewski v. Warren Hills Reg'l Bd., 307 F.3d 243
(3rd Cir. 2002) .........................................23,27-28

Thomson v. Belton, 2018 WL 6173443 (D. Md. Nov. 26 2019)....55,56

Thornton v. Potamkin Chevrolet, 94 N.J. 1 (1983)............61,72

Tratton v. City of Woodbury, 799 F.Supp.2d 417 (D.N.J. 2011)...17

Turnpike Authority v. AFSCME Council 73,
150 N.J. 331 (1997)...........................................74

UMW Post, Inc. v. Bd. of Regents of Univ. of Wis. Syst.,
774 F. Supp. 1163 (E.D. Wis. 1989)......................23,29-30

United States v. Miller, 767 F.3d 585 (6th Cir. 2014) .........41

Walsh v. Sto-Rox Sch. Dist., 532 A.2d 547 (Pa. Commw. Ct. (1987)
..............................................................57

Watson v. Rozum, 834 F.3d 417 (3rd Cir. 2007) ................53

Westbrook v. Teton County Sch. Dist. No. 1, 918 F. Supp 1475
(D. Wyo. 1996)..............................................34,37

CASES (cont'd)

Whitney v. California, 274 U.S. 357 (1927).....................18

Williams v. Civil Serv. Comm'n, 66 N.J. 152 (1974).............60

Young v. Pleasant Valley Sch. Dist., 956 F.Supp.2d 589
(M.D. Pa. 2013)................................................41

CONSTITUTIONS AND STATUTES

U.S. Constit., amend. I.......................................16

U.S. Constit., amend. XIV.................................25,66

N.J. Constit., art. 1, § 1...............................44,45,85

N.J. Constit., art. 1, § 6...............................16,22,38

42 U.S.C. § 1983........................................16-17,42

N.J.S.A. 10:6-2...............................................17

N.J.S.A. 11A:1-1...............................................2

N.J.S.A. 11A:1-2..............................................16

N.J.S.A. 11A:2-6..............................................16

N.J.S.A. 11A:2-11.............................................16

N.J.S.A. 11A:3-4..............................................79

N.J.S.A. 18A:6-18.........................................82,83

N.J.S.A. 18A:64-21.2..........................................69

REGULATIONS

N.J.A.C. 4A:2-1.1.........................................86,88

N.J.A.C. 4A:2-1...............................................78

N.J.A.C. 4A:2-2.1.........................................75,78

N.J.A.C. 4A:2.2...............................................82

N.J.A.C. 4A:2-3...............................................82

N.J.A.C. 4A:7-1.1....................................................75

N.J.A.C. 4A:7-3.1....................................................75

N.J.A.C.4A:7.3.2.................................................passim


COURT RULES

N.J.R.E. 801........................................................89

R. 1:36-6.......................................................17,87

R. 2:10-5.......................................................92,96


OTHER AUTHORITY

KIRSTEN POWERS, THE SILENCING — HOW THE LEFT IS KILLING FREE
SPEECH (2015) ......................................................30

TABLE OF APPENDIX

Notice of Appeal and Case Information Statement A-2878-18
dated 3/8/19                                                        Pa1

Amended Notice of Appeal and Case Information
Statement A-2540-18 dated 3/5/19                                    Pa11

Notice of Appeal and Case Information Statement A-2540-18
dated 2/15/19                                                       Pa22

Letter from Jennifer Peters, Director of Human Resources,
to Dr. Davida Schuman dated 1/15/19 Imposing Disciplinary
Action for Violations of the State Policy Against
Discrimination in the Workplace and for Conduct Unbecoming  Pa33

Letter from Jeffrey H. Toney, Ph.D., Provost and
Vice-President for Academic Affairs, toe Davida Schuman
dated 1/14/19 Assigning Non-Teaching Assignment for
the Spring Term 2019                                               Pa35

Letter from Christopher Myers to Robert Fagella
Dated 1/2/19 denying Motion for Reconsideration                    Pa36

Final Administrative Action of Civil Service Comm'n
In the Matter of Cheryl Borowski v. Kean University                Pa38

Motion for Reconsideration dated 11/1/18 from Civil
Service Commission's Denial of Jurisdiction to Hear
Appeal                                                             Pa41

Administrative Law Judge's Initial Decision of Dismissal
In the Matter of Cheryl Borowski v. Kean University                Pa45

Letter from Christopher Myers to Administrative Law Judge
Testa dated 10/19/18 Withdrawing Referral of the
Matter of Cheryl Borowski v. Kean University
to the Office of Administrative Law                                Pa48

Letter from Deputy Attorney General Marolhin Mendez
to Administrative Law Judge Testa dated 10/4/18
requesting withdrawal of the Matter of Cheryl Borowski
v. Kean University                                                 Pa50

Letter from Christopher Myers to Robert Fagella dated
10/1/18 declining jurisdiction to hear the appeal in the
Matter of Davida Schuman v. Kean University                        Pa51

Letter from Robert Fagella to Kenneth Green dated 9/24/18
requesting further clarification of the finality
of Kean University's 8/27/18 "final determination" finding
Davida Schuman in violation of the State Policy
Prohibiting Discrimination in the Workplace                    Pa53

Letter from Kenneth Green to Robert Fagella dated 9/18/18
responding to Fagella's request for clarification of the
finality of Kean University's 8/27/18 "final determination"
finding Davida Schuman in violation of the State Policy
Prohibiting Discrimination in the Workplace                    Pa54

Email from Robert Fagella to A. Kelly and Charlie Williams
Dated 9/14/18 seeking clarification of the finality
of Kean University's 8/27/18 "final determination" finding
Davida Schuman in violation of the State Policy
Prohibiting Discrimination in the Workplace                    Pa55

Grievance of Davida Schuman dated 9/13/18 contesting
the "final determination" of Kean University finding
violations of the State Policy Prohibiting Discrimination
in the Workplace                                               Pa56

Letter from Robert Fagella to Charlie Williams dated
9/11/18 requesting confirmation that the "final decision"
Of Kean University dated 8/27/18 was final for the
Purposes of filing an appeal to the Civil Service
Commission                                                     Pa58

"Final Determination" letter from Audrey Kelly to Davida
Schuman dated 8/27/18 finding her in violation of the
State Policy Prohibiting Discrimination in the Workplace       Pa59

Notes of interview between Charlie Williams and Davida
Schuman dated 8/15/18 regarding alleged violations of the
State Policy Prohibiting Discrimination in the Workplace       Pa61

Statement of Davida Schuman dated 8/14/18 responding
to alleged violations of the State Policy Prohibiting
Discrimination in the Workplace                                Pa62

Email from Charlie Williams to Davida Schuman and
Robert Fagella dated 8/1/18 providing "additional
information" pertaining to Williams' investigation into
complaints of violations of the State Policy Prohibiting
Discrimination in the Workplace                                Pa65

Letter from Robert Fagella to Charlie Williams dated
6/25/18 noting his representation of Davida Schuman and
requesting information pertaining to the allegations of
violations of the State Policy Prohibiting Discrimination
in the Workplace                                        Pa67

Letter from Charlie Williams to Davida Schuman dated
5/24/18 notifying Schuman of a complaint Prohibiting her for
Violations of the State Policy Prohibiting Discrimination
In the Workplace                                        Pa69

New Jersey State Policy Prohibiting Discrimination in
the Workplace                                           Pa70

Kean University New Jersey State Model Procedures for
Internal Complaints Alleging Discrimination in the
Workplace                                               Pa76

Email from Davida Schuman to Diane Tracey dated
2/1/18 regarding "Note from Dr. Tracey"                 Pa82

Unpublished decision in In the Matter of J.L.,
2016 WL 512431 (App. Div. Feb. 10, 2016)                Pa84

Unpublished decision in In the Matter of T.M.,
2013 WL 2301090 (App. Div. May 28, 2013)                Pa87

Unpublished decision in Sharp v. Kean Univ.,
2014 WL 6908775 (D.N.J. Sept. 8, 2014                   Pa91

Unpublished decision in Coursey v. City of Atl. City,
2013 WL 5676851 (App. Div. Oct. 21, 2013)               Pa96

Unpublished decision in Thomson v. Belton,
2018 WL 6173443 (D. Md. Nov. 26, 2018)                  Pa105

## PRELIMINARY STATEMENT

The instant appeal involves questions regarding the applicability and constitutionality of regulations issued by the New Jersey Civil Service Commission ("Commission"), titled the "New Jersey State Policy Prohibiting Discrimination In The Workplace" ("Policy"), N.J.A.C. 4A:7-3.1, et seq., and regarding the appellate rules, as interpreted by the Commission, relating to appeals to the Commission, N.J.A.C. 4A:2-1.1, et. seq., and N.J.A.C. 4A:7-3.2(m), et seq.

10    Appellant Dr. Davida Schuman is a tenured professor at Kean University ("Kean" or "University"). By virtue of an email that she sent to another professor, Dr. Schuman was charged with religious discrimination in violation of the Policy. The University issued a decision on August 27, 2018, which it designated as a "final determination," indicating that it had concluded that Dr. Schuman had violated the Policy. The decision, however, did not indicate that any disciplinary action was being taken against Dr. Schuman. The letter stated that if Dr. Schuman wished to appeal the decision, she would have to
20    file an appeal with the Commission within 20 days and specified the address to which the appeal had to be sent. Since the "final determination" did not indicate that any disciplinary action was being taken, in order to evaluate whether an appeal was warranted, Dr. Schuman's then attorney contacted the University

to obtain a clarification of the "final determination" in order to confirm that it was indeed final and that no additional disciplinary action would be taken. When the attorney could not obtain a clarification, he filed an appeal with the Commission at the specified address within the twenty-day deadline.

On October 1, 2018, Mr. Christopher Myers, Director of the Civil Service Commission (hereafter the "Director"), sent a letter to Dr. Schuman's attorney indicating her appeal would not be presented to the Commission because professors are not

10   covered by Title 11A, the Civil Service Act, and therefore the Commission did not have jurisdiction to consider the appeal. On November 1, 2018, Dr. Schuman's attorney filed a Motion for Reconsideration with the Commission, noting that under the express terms of N.J.A.C. 4A:7-3.2(n), Dr. Schuman had a right to appeal to the Commission. On January 2, 2019, the Director sent a letter to Dr. Schuman's attorney, reiterating his position that since Dr. Schuman was a professor, the Commission did not have jurisdiction to hear the appeal.

Dr. Schuman maintains that the Commission's rejection of her

20   appeal is erroneous on several grounds: (1) the Director's position is contrary to the express terms of the Policy; (2) The appeal rules as interpreted by the Director are contrary to provisions in the New Jersey Civil Service Act, N.J.S.A. 11A:1-1, et seq.; (3) the Director's interpretation of the appellate

2

rules violates the Equal Protection Clause of the 14th Amendment, as well as Article 1, §1 of the New Jersey Constitution.

If the Commission lacks jurisdiction to consider Appellant's appeal from the finding of a violation of the Policy, then the Policy cannot be applicable to her in the first instance because she does not have the same rights as others to whom the Policy applies. Alternatively, if the Policy does apply to her, then the decision of the Director to deny jurisdiction was arbitrary, capricious and unreasonable and should be reversed.

Rather than remand the matter to the Commission for a hearing, however, Dr. Schuman urges that the Court assert original jurisdiction over this matter pursuant to R. 2:10-5. The Policy is facially unconstitutional, since it violates both the 1st Amendment and Article 1, §6 of the New Jersey Constitution, because it is not content or viewpoint neutral, and is unconstitutionally vague and overbroad. These infirmities so permeate the Policy that it is not salvageable. Dr. Schuman cannot be held to have violated a policy that is itself unconstitutional. In the interest of judicial economy, the Court should assert original jurisdiction over this matter and overturn the ruling by the University.

## STATEMENT OF PROCEDURAL HISTORY

Dr. Schuman and Dr. Diane Tracey were colleagues at Kean University. After a series of emails were exchanged between the

3

two professors, Dr. Schuman received a letter dated May 24, 2018, from Dr. Charlie Williams, Director of Affirmative Action Programs at Kean, advising her that Dr. Tracey had filed a Complaint against her alleging that she had violated the New Jersey Policy Prohibiting Discrimination in the Workplace ("Policy"), N.J.A.C. 4:7-3.1. Pa69. On August 1, 2018, Dr. Williams sent an email to Dr. Schuman, copied to her attorney, Mr. Fagella, indicating he was providing additional information regarding his investigation of Dr. Tracey's Complaint. He

10  indicated that some students had also complained of her conduct in class. Pa65.

On August 27, 2018, Audrey Kelly, Chief of Staff of the Office of University President Dawood Farahi, sent a letter to Dr. Schuman advising her that the investigation had concluded that she had violated the Policy. Pa59. The "final determination," however, did not state that any disciplinary action was going to be imposed on Dr. Schuman for the finding that she had violated the Policy.

Pursuant to the instructions in the notification letter,

20  Schuman's counsel filed an appeal with the Commission on September 13, 2018, stating that Dr. Schuman contested the determination she had violated the Policy and requested that the decision be reversed. Pa56. On October 1, 2018, Mr. Christopher Myers, Director of the Commission, sent a letter to Schuman's

counsel stating that the Commission would not hear the matter as Dr. Schuman, being a professor, was not subject to the Civil Service Act. Pa51.

In accordance with N.J.A.C. 4A:2-1.6, on November 1, 2018, Schuman filed a Motion for Reconsideration with the Commission within forty-five days of Mr. Myers' October 1 decision. Pa41. On January 2, 2019, the Director sent a letter to Schuman's counsel rejecting the Motion for Reconsideration and reiterating the Commission's position that professors charged with a
10   violation of the Policy are precluded from filing an appeal with the Commission because they are not subject to Title 11A. Pa36.

On Feb. 15, 2019, Appellant Schuman filed a timely Notice of Appeal from the Commission's 1/2/19 denial of reconsideration and included an appeal from the letters sent by Dr. Toney and Ms. Peters.   Pa27. On 3/1/19, the Case Manager notified Appellant's counsel that separate appeals had to be filed with regard to the Commission and the University. An Amended Notice of Appeal was thereafter filed on 3/5/19 removing references to disciplinary actions taken by Kean University after the
20   Commission declined jurisdiction to hear the appeal. Pa12. Those matters were made the subject of a separate appeal docketed as Appeal A-2878-18.  Pa1.  The two appeals were consolidated by Order of the Appellate Division on August 27, 2019.

## STATEMENT OF FACTS

Appellant Davida Schuman is a tenured professor of Literacy in the Department of Special Education and Literacy at Kean University where she has been teaching since 1967 and where she obtained tenure in 1970. For some time prior to 2018, Dr. Schuman, who is Jewish, had a rather fractious relationship with another professor in the same Department, Dr. Diane Tracey, who is also Jewish. On February 1, 2018, Dr. Schuman sent a lengthy email to Dr. Tracey in which she made critical remarks about what she regarded as Dr. Tracey's insincere commitment to Judaism. Pa82. That email was triggered by exchange between the two in the days before.

On May 24, 2018, Dr. Charlie Williams, Director of Affirmative Action Programs at Kean, sent a letter to Dr. Schuman in which he indicated that Dr. Tracey had filed a Complaint against Schuman alleging that she had violated the Policy by engaging in religious discrimination by virtue of the statements in her Feb. 1 email. Dr. Williams also indicated that students in one of Dr. Schuman's Fall, 2017 classes claimed she had made "offensive racial/ethnic references." Pa69.

Enclosed with the letter were documents titled "New Jersey State Policy Prohibiting Discrimination In The Workplace" ("Policy"), Pa70, and "New Jersey State Model Procedures For Internal Complaints Alleging Discrimination In The Workplace"

6

("Procedures"). Pa74.

Dr. Schuman and Dr. Tracey were hierarchical co-equals. It is undisputed that Dr. Schuman at no point took any adverse employment action against Dr. Tracey and that, in any event, she had absolutely no authority or ability to do so.

Dr. Schuman retained Robert Fagella, Esq., to represent her in the matter. On June 25, 2018, Mr. Fagella sent a letter to Williams requesting that he provide a copy of Dr. Tracey's Complaint, as well as Dr. Schuman's entire personnel file. Pa67. Dr. Williams did not provide Mr. Fagella with a copy of the Complaint, or with any of the other documents he requested. Despite several requests directed to Kenneth Green, Chief Labor Counsel for the University, Mr. Green refused to provide a copy of the Complaint to Mr. Fagella and Dr. Schuman has never seen it.[1]

On August 1, 2018, Dr. Williams sent an email to Dr. Schuman, copied to Mr. Fagella, indicating he was providing additional information regarding his investigation of Dr. Tracey's Complaint. Pa65. Dr. Williams indicated some students in Dr. Schuman's Fall, EDUC 3400 05 class alleged she had made

---

[1] Mr. Green's refusal to provide Dr. Schuman with a copy of the Complaint violated the rulings of the New Jersey Supreme Court in Dixon v. Rutgers, the State University of N.J., 110 N.J. 432, 454-58 (1988), and of this court in New Jersey Div. of Youth & Family Services v. M.R., 314 N.J. Super. 390, 415-16 (App. Div. 1998).

7

"insensitive racial and ethnic remarks during the class and in some instances, these remarks were directed at specific students." The students alleged Dr. Schuman had commented about a student's accent, had made comments about people of Cuban descent, and had made "insensitive comments about African American/Blacks" by referring to them as 'Negroes.'"

As part of his investigation, Dr. Williams held an interview with Dr. Schuman and her counsel on August 15, 2018. Prior to the meeting, Dr. Schuman submitted to Dr. Williams a Statement of Davida Schuman ("Statement"). Pa62. In her Statement, Dr. Schuman explained that the email to Dr. Tracey was intended as "commentary that related to our shared religious background and the very strong feelings I have because of my own experiences as a victim of prejudice and discrimination." Dr. Schuman disputed the allegation that she had made racist or ethnically insensitive remarks in her classroom.

Dr. Williams conducted his interview of Dr. Schuman on August 15, 2018 and prepared a memorandum during the interview of what transpired, which Dr. Schuman signed. Pa61. In his memorandum, Dr. Williams indicated that Dr. Schuman denied the claim that she had commented on a student's accent. Dr. Schuman further indicated: "I have discussed the importance of speaking English clearly as a future teacher, especially in primary grades."

On August 27, Audrey Kelly, Chief of Staff of the Office of

8

University President Dawood Farahi, sent a letter to Dr. Schuman stating that it was a "final determination" and that it found that Dr. Schuman had violated the Policy by making demeaning and derogatory remarks in her email to Dr. Tracey and by comments to a student related to her name, accent, and manner of speaking English. The "final determination" also indicated that the alleged "comments about Cubans and African Americans" did not constitute a violation of the State Policy." Pa59 The letter instructed that if Schuman wished to appeal the decision, she had to submit a written appeal to the New Jersey Civil Service Commission within twenty (20) days. Pa59.

The "final determination" did not state that any disciplinary action was going to be imposed on Dr. Schuman for the finding that she had violated the Policy, nor did it even intimate that any further action was contemplated. On September 11, 2018, Mr. Fagella wrote a letter to Ms. Kelly, copied to Dr. Williams, stating, in relevant part, "[a]s you know, there is an appeal process to the Civil Service Commission. Before I make any decision in that regard, I would appreciate if you would clarify the decision itself. Please confirm that this is a final decision and that no further determinations will be issued regarding any potential penalties. Because time is of the essence, please advise immediately. Thank you." Pa58.

The twenty-day deadline for filing an appeal with the Civil

Service Commission ("Commission") was September 16, 2018. When
Mr. Fagella did not receive a response from Ms. Kelly, he filed
an appeal with the Commission on September 13, stating Dr.
Schuman contested the determination she had violated the Policy
and requested the decision be reversed. Pa56.  On September 14,
Mr. Fagella sent an email to Ms. Kelly and Dr. Williams, again
requesting a clarification regarding the "final determination"
and assurance no further action would be taken. Pa55.

On September 18, Mr. Green sent a letter to Mr. Fagella,
10    stating that the "final determination" spoke for itself. Pa54.
Mr. Fagella responded by letter dated September 24, 2018, again
requesting a clarification of the "final determination." Pa53.
Mr. Green never responded to Mr. Fagella's request for a
clarification of the "final determination," nor for additional
information regarding what "University procedures" were being
referred to in Mr. Green's September 18 correspondence.

Thereafter, on October 1, 2018, Christopher Myers, Director
of the Civil Service Commission, sent a letter to Fagella,
stating Dr. Schuman's appeal was being dismissed because the
20    Commission did not have jurisdiction over appeals by university
professors contesting a ruling that they had violated the
Policy. Pa51.

In accordance with N.J.A.C. 4A:2-1.6, on November 1, Mr.
Fagella filed a Motion for Reconsideration within forty-five

days of the Director's October 1 decision denying jurisdiction.
Pa41. Fagella noted in the motion that N.J.A.C. 4A:7-3.2(m),
cited by Mr. Myers, applies to the appellate rights of a
complainant who has filed a discrimination charge under the
Policy and restricts such appeal rights to employees "in the
career, unclassified, or senior executive service." By contrast,
N.J.A.C. 4A:7-3.2(n) provides "where a violation has been
substantiated and no disciplinary action recommended, the party
against whom the complaint was filed may appeal the
10  determination to the Civil Service Commission at the address
indicated in [subsection] (m) above within 20 days of receipt of
the final letter of determination by the state agency head or
designee."  Pa43 (emphasis supplied). Unlike Subsection (m),
Subsection (n) was not restricted to employees in the career,
unclassified, or senior executive service, but applied to any
New Jersey employee charged with a violation of the Policy,
where the charge was substantiated but no disciplinary action
was recommended, which was the case with regard to the August
27, 2018 "final determination" issued by the University. Mr.
20  Fagella accordingly requested that Dr. Schuman's appeal be
reinstated. Pa44.

    On January 2, 2019, the Director sent a letter to Fagella
rejecting the Motion for Reconsideration, reiterating the
Commission's position that professors charged with a violation

of the Policy are precluded from filing an appeal with the Commission because they are not subject to Title 11A. Pa36.[2]

On January 14, 2019, Dr. Jeffrey H. Toney, Provost and Vice President for Academic Affairs at Kean, sent a letter to Dr. Schuman, stating that "pursuant to Article XII of the State of New Jersey and Council of New Jersey State College Locals, AFT, AFL-CIO collective negotiation agreement, you are being assigned to a non-teaching assignment effective January 22, 2019 for the Spring 2019 Semester. You are directed to report to Dr. Anthony Pittman, Acting Dean, College of Education . . . on Tuesday, January 22, 2019 to receive your non-teaching assignment."[3]  Pa35

On January 15, 2019, Jennifer Peters, Director of the Office

---

[2] The Director enclosed a comparable ruling with respect to an adjunct professor at Kean, Cheryl Borowski, whose appeal from an adverse decision by Kean with respect to a charge that she had violated the Policy was dismissed on jurisdictional grounds. Pa48. Prof. Borowski's appeal had already been assigned for hearing to an ALJ, when the Attorney General of New Jersey wrote a letter dated October 4, 2018, to the ALJ requesting that the ALJ dismiss the appeal based on the Commission's position that professors do not have a right to appeal adverse decisions of Policy violations to the Commission. Pa50. Based on that ruling, the ALJ dismissed the appeal, Pa48, which was affirmed on appeal to the Commission. Pa38.

[3]  The union which represents professors at Kean filed a grievance, regarding the non-teaching assignment given to Dr. Schuman on the basis that the University failed to consult with the union prior to issuing the assignment, as required by the express terms of Article XII(B)(7). The union accordingly maintained that the assignment was null and void and that, until the University consulted with the union, the January 15 letter had to be rescinded. The University denied the grievance and did not rescind the letter or withdraw the non-teaching assignment.

FILED, Clerk of the Appellate Division, November 18, 2019, A-002540-18, AMENDED

of Human Resources, sent Dr. Schuman a letter stating the Office
of Affirmative Action Programs had concluded its investigation
of complaints filed against her and the matter had been referred
to her Office for appropriate action. Pa33. After first
reiterating that it had been determined that Dr. Schuman had
violated the Policy. the letter proceeded to state:

> A review of your conduct revealed that you made
> demeaning and/or derogatory religious-based comments
> as well as offensive racial and/or ethnic references.
> The State Policy prohibits the "use of derogatory or
> demeaning references" with respect to protected
> categories covered by the Policy. Not only was your
> behavior found to be in violation of the Policy, but
> it also constitutes conduct unbecoming.

> In addition, it was also alleged that you
> inappropriately implemented the Student Instructional
> Report II (SIR II) course surveys. After investigating
> this matter, the Office of Human Resources concluded
> that your conduct in distributing, conducting and
> collecting the surveys constituted a violation of the
> University's SIR II policy and guidelines.[4]

> The University takes these matters seriously and
> expects that all employees, students and prospective
> students are treated with dignity and respect.
> Accordingly, this is formal notification that the
> following disciplinary charges are being made against
> you:

>> 1. Conduct Unbecoming.
>> 2. Other Sufficient Cause:
>>    a. Violation of the *New Jersey
>>    State Policy Prohibiting Discrimination
>>    in the Workplace* (a zero tolerance
>>    policy)

---

[4] SIR II refers to Student Instructional Reports that students
prepare evaluating their professors.

Based upon the above facts, the following disciplinary action will be taken against you:

1.    This letter shall serve as an Official Written Reprimand.
2.    You will be required to complete an Affirmative Action Programs training delivered by the American Conference on Diversity. You will be notified when the course has been scheduled.

Pa33-34.

As part of her non-teaching assignment, Dr. Schuman was given a schedule which outlined her daily assignments, beginning on Jan. 22, 2019, thru June 28, 2019.  The schedule indicated that Dr. Schuman was required to sign in every day at 9:00 AM and sign out at 5 PM. She was given a designated time for lunch from 12-1 P.M. Each day specified a research project that Dr. Schuman was required to perform, rather than teaching the four classes that she was originally scheduled to be teaching during the Spring, 2019 term.[5]

Dr. Schuman filed a timely appeal from both the Commission's denial of the Motion for Reconsideration and the disciplinary letters sent by Dr. Toney and Ms. Peters.

On June 14, 2019, Assistant Attorney General Christopher

---

[5]   While Dr. Schuman was paid her full salary during the period of the non-teaching assignment, because she was not teaching any classes, the non-teaching assignment deprived her of the opportunity to apply for other teaching assignments which she regularly conducted during the summer, for which she would have earned additional income.

Weber filed the University's Statement of Items Comprising The
Record On Appeal.   The document listed a total of 37 items as
part of the record in the University appeal, one of which
encompassed 27 documents. Many of the items listed pre-dated the
email which Dr. Schuman sent to Dr. Tracey on February 1, 2018,
including items dated 2012 through 2015. The list included many
documents which Dr. Schuman had never seen, including hearsay
statements by students which had never been shown to Dr.
Schuman, since there has never been an evidentiary hearing
10  related to the accusations which are the subject of this
consolidated appeal. By letter dated July 9, 2019, Dr. Schuman's
attorney advised Mr. Weber that his client had copies of only 4
of the 37 items listed in the "certified" record and requested
that Mr. Weber produce all of the documents included in the
list.  After Dr. Schuman's attorney and Mr. Weber had executed a
Confidentiality Agreement, Mr. Weber provided copies of the
requested documents during the week of September 30, 2019.[6]

20

---

[6]  That disclosure is the subject of a pending motion to strike
portions of the record which are not relevant to the alleged
Policy violations.

15

## LEGAL ARGUMENT

### POINT I

**THE POLICY IS FACIALLY UNCONTSITUTIONAL, AND UNCONSTITUTIONAL AS APPLIED TO DR. SCHUMAN, UNDER BOTH THE UNITED STATES AND NEW JERSEY CONSTITUTIONS. (This issue was not addressed below.)**

The free speech provision of the 1st Amendment of the United States Constitution is applicable to the states under the due

10    process clause of the 14th Amendment. <u>Gitlow v. People of State of New York</u>, 268 U.S. 652 (1925). Kean is a public university and consequently its conduct in implementing the Policy, which has been promulgated by the Commission pursuant to its powers and duties as defined in <u>N.J.S.A.</u> 11A:1-2, 11A:2-6, and 11A:2-11, constitutes state action which must comport with the requirements and protections set forth in the 1st Amendment and in Article I, §6 of the New Jersey Constitution. In addition, Dr. Schuman is a tenured professor, by virtue of which she has both property and liberty interests protected by the due process

20    requirements of the 14th Amendment and by Article 1, § 1, of the N.J. Constitution. <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532 (1985); <u>Memphis Community Sch. Dist. v. Stachura</u>, 477 U.S. 299 (1986); <u>Nicoletta v. No. Jersey Dist. Water Supply Comm'n</u>, 77 N.J. 145 (1978). Dr. Schuman is therefore entitled to protect her constitutional rights pursuant to 42 <u>U.S.C.</u> § 1983, which states, in relevant part:

> Every person who, under color of any statute,

16

ordinance, regulation, custom, or usage, of any State
or Territory or the District of Columbia, subjects, or
causes to be subjected, any citizen of the United
States or other person within the jurisdiction thereof
to the deprivation of any rights, privileges, or
immunities secured by the Constitution and laws, shall
be liable to the party injured in an action at law,
suit in equity, or other proper proceeding for redress[7]

10      [8])

Dr. Schuman is also entitled to invoke the protection of the

New Jersey Civil Rights Act, N.J.S.A. 10:6-2, against any effort

to deprive her of "any substantive due process or equal

protection rights, privileges or immunities secured by the

Constitution or laws of the United States, or any substantive

rights, privileges or immunities secured by the Constitution or

laws of [New Jersey]." The Civil Rights Act is the New Jersey

equivalent of 42 U.S.C. § 1983. Trafton v. City of Woodbury, 799

F.Supp.2d 417, 443 (D.N.J. 2011).

20  **A. The Policy Is Facially Unconstitutional Because It Is
    Neither Content Nor Viewpoint Neutral.**

The constitutionality of any governmental restriction of

speech must be evaluated by applying strict scrutiny. A state

must show that the "regulation is necessary to serve a

---

[7]     While this issue does not need to be resolved in this
appeal, under the factors set forth in Fuchilla v. Layman, 109
N.J. 319 (1988), Kean University constitutes a "person" under §
1983. See also Sharp v. Kean Univ., 2014 WL 6908775 (D.N.J. Dec.
8, 2014). (In accordance with R. 1:36-3, a copy of the decision
in Sharp is included in the Appendix at Pa91).

[8]

17

FILED, Clerk of the Appellate Division, November 18, 2019, A-002540-18, AMENDED

compelling state interest and that it is narrowly drawn to achieve that end." Perry Ed. Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 45 (1983). The framers of the Constitution, "[b]elieving in the power of reason as applied through public discussion . . . eschewed silence coerced by law – the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed." Whitney v. California, 274 U.S. 357, 375-76 (1927) (Brandeis, J. concurring.) Consequently, a government may not regulate speech based on its content or viewpoint, and a regulation is subject to being overturned if it does either. See generally Planet Aid v. City of St. Johns, 782 F.3d 318 (6th Cir. 2015)(municipal ordinance which banned outdoor charitable donation bins was not content neutral and therefore violated the 1st Amendment).[9]

---

[9] An example demonstrates the distinctions. A municipality may constitutionally enact an ordinance that requires that billboards within the city's limits not exceed certain dimensions, e.g., 15 ft. by 8 ft. Such an ordinance is content neutral, and all things being equal, does not violate the 1st Amendment. However, an ordinance that allows billboards satisfying the specified dimensions, but prohibits such billboards if they convey any message relating to abortion, regardless whether pro-life or pro-choice, is not content neutral and must advance a compelling interest of the municipality in order to survive constitutional scrutiny. By contrast, an ordinance that specifies such dimensions, but only prohibits billboards satisfying the dimensions which are pro-life, or alternatively, pro-choice, is not viewpoint neutral and will not survive a constitutional challenge. As noted in Planet (footnote continued)

18

In R.A.V. v. St. Paul, 505 U.S. 377 (1992), a teenager who burned a cross on the lawn of a Black family was charged with violating a St. Paul Bias-Motivated Crime Ordinance. The Ordinance stated:

> Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to
10 > know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.

Id. at 380.

The teenager challenged the constitutionality of the ordinance under the 1st Amendment, arguing that the ordinance was overbroad. The Minnesota Supreme Court rejected the argument, holding that "the ordinance is a narrowly tailored means toward
20 accomplishing the compelling governmental interest in protecting the community against bias-motivated threats to public safety and order." The Supreme Court granted certiorari and, holding that the ordinance violated the 1st Amendment, reversed. Justice Scalia, writing for the majority observed that:

> When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists. Such a reason, having been adjudged neutral enough to support
30 > exclusion of the entire class of speech from First

_____

Aid, supra, at 326-27, a regulation which is not viewpoint neutral is necessarily not content neutral. (emphasis supplied).

Amendment protection, is also neutral enough to form the basis of distinction within the class. To illustrate: a State might choose to prohibit only that obscenity which is the most patently offensive *in its prurience* — *i.e.*, that which involves the most lascivious displays of sexual activity. But it may not prohibit, for example, only that obscenity which includes offensive *political* messages.

\* \* \* \* \*

10    Applying these principles to the St. Paul ordinance, we conclude that, <u>even as narrowly construed by the Minnesota Supreme Court, the ordinance is facially unconstitutional</u>. Although the phrase in the ordinance, "arouses anger, alarm or resentment in others," has been limited by the Minnesota Supreme Court's construction to reach only those symbols or displays that amount to "fighting words," the remaining, unmodified terms make clear that the ordinance applies only to "fighting words" that
20    insult, or provoke violence, "on the basis of race, color, creed, religion or gender." Displays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics. Those who wish to use "fighting words" in connection with other ideas — to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality — are not covered. The First Amendment does not permit St. Paul to impose special
30    prohibitions on those speakers who express views on disfavored subjects.

\* \* \* \* \*

In its practical operation, moreover, the ordinance goes even beyond mere content discrimination to actual viewpoint discrimination. Displays containing some words — odious racial epithets, for example — would be prohibited to proponents of all views. But "fighting
40    words" that do not themselves invoke race, color, creed, religion, or gender — aspersions upon a person's mother, for example — would seemingly be usable *ad libitum* in the placards of those arguing *in favor* of racial, color, etc., tolerance and equality, but could not be used by those speakers' opponents.

20

One could hold up a sign saying, for example, that all "anti-Catholic bigots" are misbegotten; but not that all "papists" are, for that would insult and provoke violence "on the basis of religion." St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.

\* \* \* \* \*

... [T]he reason why fighting words are categorically
10    excluded from the protection of the First Amendment is not that their content communicates any particular idea, but that their content embodies a particularly intolerable (and socially unnecessary) *mode* of expressing *whatever* idea the speaker wishes to convey. St. Paul has not singled out an especially offensive mode of expression — it has not, for example, selected for prohibition only those fighting words that communicate ideas in a threatening (as opposed to a merely obnoxious) manner. Rather, it has proscribed
20    fighting words of whatever manner that communicate messages of racial, gender, or religious intolerance. Selectivity of this sort creates the possibility that the city is seeking to handicap the expression of particular ideas. That possibility would alone be enough to render the ordinance presumptively invalid, but St. Paul's comments and concessions in this case elevate the possibility to a certainty.

\* \* \* \* \*

Let there be no mistake about our belief that burning
30    a cross in someone's front yard is reprehensible. But St. Paul has sufficient means at its disposal to prevent such behavior without adding the First Amendment to the fire. (Citations omitted; italics in the original; emphasis supplied.)

Id. at 388-96

In sum, the Court held the ordinance was unconstitutional

because it was neither content nor viewpoint neutral – it

prohibited certain speech based only on its content exhibiting

race, religion, or ethnic bias, but not equally hurtful speech that did not exhibit such characteristics. The ordinance was unconstitutional because it was under-inclusive, and thereby selective based on the viewpoint being expressed. A legislative enactment, whether it be a statute, an ordinance, or an agency policy which is not content and viewpoint neutral is <u>per se</u> facially unconstitutional. Commensurate protection of free speech rights are afforded under Article 1, §6 of the New Jersey Constitution. <u>See</u> <u>State v. Schmid</u>, 84 N.J. 535 (1980).

10    In <u>State v. Vawter</u>, 136 N.J. 56 (1994), an individual who spray painted a Nazi swastika and other anti-Semitic insults on a synagogue was prosecuted under a New Jersey statute comparable in its terms to the St. Paul ordinance. Applying the ruling in <u>R.A.V.</u>, the N.J. Supreme Court held that the statute was unconstitutional saying

> We conclude that even if we were to read Sections 10
> and 11 [of the statute] to regulate only fighting
> words, a class of proscribable speech, these statutes
> do not fit within any of the exceptions to the
20     prohibition against content discrimination.

> <u>Id</u>. at 73-74.

"First Amendment rights applied in light of the special characteristics of the school environment, <u>are available to teachers and students</u>. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." <u>Tinker v. Des</u>

Moines Independent Community Sch. Dist., 393 U.S. 503, 506 (1969)(emphasis supplied). Applying the reasoning in R.A.V., numerous courts have held that student and academic employee speech codes promulgated by universities and public employers focusing on speech that demeans another based on race, religion, ethnicity, sexual orientation, etc., are unconstitutional. See, e.g., Dejohn v. Temple Univ., 537 F.3d 301 (3d Cir. 2008); Saxe v. State College Area Sch. Dist., 240 F.3d 200 (3d Cir. 2001); Sypniewski v. Warren Hills Reg'l Bd., 307 F.3d 243 (3d Cir. 2002); Dambrot v. Central Michigan Univ., 55 F.3d 1177 (6th Cir. 1995); IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ., 993 F.2d 386 (4th Cir. 1993); College Republicans at San Francisco State Univ. v. Reed, 523 F. Supp. 2d 1005 (N.D. Cal. 2007); Roberts v. Haragan, 346 F. Supp. 2d 853 (N.D. Tex. 2004); UWM Post, Inc. v. Bd. of Regents of Univ. of Wis. Syst., 774 F. Supp. 1163 (E.D. Wis. 1991); Doe v. Univ. of Mich., 721 F. Supp. 852 (E.D. Mich. 1989) (the latter two cases were decided before R.A.V., but applied similar principles). The ruling in Saxe, supra, written by then Judge Alito in the 3d Circuit with regard to a public school district's anti-harassment policy, is instructive:

> In August 1999, the State College Area School District ("SCASD") adopted an Anti-Harassment Policy ("the Policy").

* * * * *

23

The Policy begins by setting forth its goal —
"providing all students with a safe, secure, and
nurturing school environment" — and noting that
"[d]isrespect among members of the school community is
unacceptable behavior which threatens to disrupt the
school environment and well being of the individual."
The second paragraph contains what appears to be the
Policy's operative definition of harassment:

> Harassment means verbal or physical conduct
> based on one's actual or perceived race,
> religion, color, national origin, gender,
> sexual orientation, disability, or other
> personal characteristics, and which has the
> purpose or effect of substantially
> interfering with a student's educational
> performance or creating an intimidating,
> hostile or offensive environment.

Id. at 202

The Policy continued by providing several examples of

"harassment:"

> Harassment can include any unwelcome verbal, written
> or physical conduct which offends, denigrates or
> belittles an individual because of any of the
> characteristics described above. Such conduct
> includes, but is not limited to, unsolicited
> derogatory remarks, jokes, demeaning comments or
> behaviors, slurs, mimicking, name calling, graffiti,
> innuendo, gestures, physical contact, stalking,
> threatening, bullying, extorting or the display or
> circulation of written material or pictures.

> These examples are followed by a lengthy section
> captioned "Definitions," which defines various types
> of prohibited harassment, including "Sexual
> harassment," "Racial and color harassment,"
> "Harassment on the basis of religion," "Harassment
> based on national origin," "Disability harassment,"
> and "Other harassment" on the basis of characteristics
> such as "clothing, physical appearance, social skills,
> peer group, intellect, educational program, hobbies or
> values, etc." The definitions state that harassment

24

"can include unwelcome verbal, written or physical conduct directed at" the particular characteristic. Examples of specific types of harassment are also provided. For example, "Racial and color harassment" is said to include "nicknames emphasizing stereotypes, racial slurs, comments on manner of speaking, and negative references to racial customs." Religious harassment reaches "derogatory comments regarding surnames, religious tradition, or religious clothing, or religious slurs or graffiti." National origins harassment includes "negative comments regarding surnames, manner of speaking, customs, language, or ethnic slurs." Harassment on the basis of sexual orientation extends to "negative name calling and degrading behavior." Disability harassment encompasses "imitating manner of speech or movement."

The Policy provides that "[a]ny harassment of a student by a member of the school community is a violation of this policy."[2] It establishes procedures for the reporting, informal mediation, and formal resolution of complaints. In addition, the Policy sets a list of punishments for harassment, "including but not limited to warning, exclusion, suspension, expulsion, transfer, termination, discharge . . ., training, education, or counseling."

The school community, by the Policy's terms, "includes, but is not limited to, all students, school employees, contractors, unpaid volunteers, school board members, and other visitors." "School employees" include, but are not limited to, "all teachers, support staff, administrators, bus drivers, custodians, cafeteria workers, coaches, volunteers, and agents of the school.

Id. at 202-03(emphasis supplied).

The court proceeded to analyze the Anti-Harassment Policy and concluded it was unconstitutional based on the content neutral principle in R.A.V., as well as violating overbreadth and vagueness parameters noting that:

This sort of content- or viewpoint-based restriction

is ordinarily subject to the most exacting First
Amendment scrutiny.

* * * * *

Loosely worded anti-harassment laws may pose some of
the same problems as the St. Paul hate speech
ordinance: they may regulate deeply offensive and
potentially disruptive categories of speech based, at
10      least in part, on subject matter and viewpoint.

* * * * *

[T]he Policy prohibits harassment based on personal
characteristics that are not protected under federal
law. Titles VI and IX, taken together with the other
relevant federal statutes, cover only harassment based
on sex, race, color, national origin, age and
disability. The Policy, in contrast, is much broader,
20      reaching, at the extreme, a catch-all category of
"other personal characteristics" (which, the Policy
states, includes things like "clothing," "appearance,"
"hobbies and values," and "social skills"). Insofar as
the policy attempts to prevent students from making
negative comments about each others' "appearance,"
"clothing," and "social skills," it may be brave,
futile, or merely silly. But attempting to proscribe
negative comments about "values," as that term is
commonly used today, is something else altogether. By
30      prohibiting disparaging speech directed at a person's
"values," the Policy strikes at the heart of moral and
political discourse — the lifeblood of constitutional
self government (and democratic education) and the
core concern of the First Amendment. That speech about
"values" may offend is not cause for its prohibition,
but rather the reason for its protection: "a principal
`function of free speech under our system of
government is to invite dispute. It may indeed best
serve its high purpose when it induces a condition of
40      unrest, creates dissatisfaction with conditions as
they are, or even stirs people to anger'" . . . No
court or legislature has ever suggested that unwelcome
speech directed at another's "values" may be
prohibited under the rubric of anti-discrimination.

We do not suggest, of course, that a public school may
never adopt regulations more protective than existing

law; it may, provided that those regulations do not
offend the Constitution. Such regulations cannot be
insulated from First Amendment challenge, however,
based on the argument that they do no more than
prohibit conduct that is already unlawful. (Citations
omitted.)

Id. at 207, 210 (citations omitted).

10          In Sypniewski, supra, the New Jersey Warren Hills School

District was confronted with a series of racial confrontations

that were disrupting the functioning of the schools. In order to

defuse the crisis, the Board passed a speech code that

prohibited the expression of language, or possession of written

materials or the wearing of clothing that expressed language,

that could be regarded as racially divisive or likely to "create

ill will." Enforcing the policy, a student who insisted on

wearing a T-shirt that repeatedly displayed the word "redneck"

was suspended. The Court observed that:

20          [P]roblematic is the phrase "creates ill will" in the
            second sentence of the policy, which reads, "District
            employees and students shall not at school, on school
            property or at school activities wear or have in their
            possession any written material, either printed or in
            their own handwriting, that is racially divisive or
            creates ill will or hatred." The focus of this phrase
            is entirely on the reaction of listeners. But by
            itself, an idea's generating ill will is not a
            sufficient basis for suppressing its expression. "The
30          mere fact that expressive activity causes hurt
            feelings, offense, or resentment does not render the
            expression unprotected" . . . As a general matter,
            protecting expression that gives rise to ill will –
            and nothing more – is at the core of the First
            Amendment.

            307 F.3d at 264.

See also Saxe, supra 240 F.3d at 215 ("The Supreme Court has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it.")

While the Court in Sypniewski struck down the particular provision at issue, it sustained the constitutionality of the balance of the speech code, despite its lack of content neutrality holding that:

> The racial harassment policy is indisputably a content-based restriction on expression, and in other contexts, may well be found unconstitutional under R.A.V. But as discussed, the public school setting is fundamentally different from other contexts, including the university setting. Primary and secondary school officials stand in a unique relationship with respect to their students, most of whom are minors. They are charged with the basic education of the nation's youth, which is "perhaps the most important function of state and local governments."

> 307 F.3d at 267 (emphasis supplied; footnote ommitted).

See also Dejohn, supra, in which the Court struck down a sexual harassment policy at Temple University as unconstitutional due to facial overbreadth, citing Sypniewski and noting that speech may not be regulated with the same rigor on a public university campus as compared to a public elementary

28

FILED, Clerk of the Appellate Division, November 18, 2019, A-002540-18, AMENDED

or high school.[10]

_____

[10] In UWM Post, supra, the Court rejected the University's defense that the Code was necessary to protect students from the creation of a "hostile environment," stating:

> The creation of a hostile environment may tend to incite an immediate breach of peace under some circumstances. Nevertheless, the term "hostile" covers non-violent as well as violent situations. Moreover, an intimidating or demeaning environment is unlikely to incite violent reaction. To "intimidate" means to "make timid; threaten" or to "discourage or inhibit by or as if by threats." To "demean" is to "debase in dignity or stature." Given these definitions of "intimidate" and "demean," this Court cannot properly find that an intimidating or demeaning environment tends to incite an immediate breach of the peace.

> * * * * *

> While the Board is correct that the language regulated by the UW Rule is likely to cause violent responses in many cases, the rule regulates discriminatory speech whether or not it is likely to provoke such a response. It is unlikely that all or nearly all demeaning discriminatory comments, epithets or other expressive behavior which creates an intimidating, hostile or demeaning environment tends to provoke a violent response. Since the UW Rule covers a substantial number of situations where no breach of the peace is likely to result, the rule fails to meet the requirements of the fighting words doctrine.

> * * * * *

> This commitment to free expression must be unwavering, because there exist many situations where, in the short run, it appears advantageous to limit speech to solve pressing social problems, such as discriminatory harassment. If a balancing approach is applied, these pressing and tangible short run concerns are likely to outweigh the more amorphous and long run benefits of free speech. However, the suppression of speech, even where the speech's content appears to have little

(footnote continued)

Any claim that the above cited cases are not relevant to the allegations against Dr. Schuman because they involved speech codes applicable to students, and therefore have no bearing on a professor's 1st Amendment rights would be specious. Under the ruling in <u>Tinker</u>, <u>supra</u>, neither students, teachers, or professors leave their 1st Amendment rights outside the elementary school, high school, college or university doors. Moreover, if individuals accused of a crime, as in <u>R.A.V.</u> and <u>Vawter</u>, <u>supra</u>, deserve to be protected against the invasion of their constitutional rights by statutes or ordinances which fail to be both content and viewpoint neutral, then surely a college professor is entitled to that same protection. [11]

_____

<u>value and great costs, amounts to governmental thought control. An individual instance of thought control may not appear to impose great costs on society. However, if a balancing test is used there are likely to be many such instances. Taken as a whole, these instances will work to dissolve the great benefits which free speech affords</u>.

774 F. Supp. at 1172-74 (citation omitted; emphasis supplied).

[11] <u>See</u> <u>also</u> KIRSTEN POWERS, THE SILENCING – HOW THE LEFT IS KILLING FREE SPEECH (2015). In The Silencing, journalist Kirsten Powers lamented the proliferation of such speech codes at universities and critiqued their chilling effect on free speech observing that

For many Americans the term "speech code" sends shivers up the spine. Yet these noxious and un-American codes have become commonplace on college campuses across the United States. They are typically (footnote continued)

FILED, Clerk of the Appellate Division, November 18, 2019, A-002540-18, AMENDED

_____

so broad that they could include literally anything
and are subject to the interpretation of school
administrators, who frequently fail to operate as
honest brokers. In the hands of the illiberal left,
the speech codes are weapons to silence anyone-
professors, students, visiting speakers-who expresses
a view that deviates from the left's worldview or
ideology. Speech that offends them is redefined as
"harassment" or "hate speech" both of which are barred
by most campus speech codes. At Colorado College, a
private liberal arts college, administrators invented
a "violence" policy that was used to punish non-
violent speech. The consequences of violating a speech
code are serious: it can often lead to public shaming,
censoring, firings, suspensions, or expulsions, often
with no due process.

Many of the incidents sound too absurd to be
true. But true they are. Consider, for example, how
Yale University put the kibosh on its Freshman Class
Council's T-shirt designed for the Yale-Harvard
football game. The problem? The shirt quoted F. Scott
Fitzgerald's line from *This Side of Paradise,* that, "I
think of all Harvard men as sissies." The word "sissy"
was deemed offensive to gay people. Or how about the
Brandeis professor who was found guilty of racial
harassment-with no formal hearing-for explaining,
indeed criticizing, the word "wetbacks." Simply saying
the word was crime enough. Another professor, this
time at the University of Central Florida, was
suspended for making a joke in class equating his
tough exam questions to a "killing spree." A student
reported the joke to the school's administration. The
professor promptly received a letter suspending him
from teaching and banning him from campus. He was
reinstated after the case went public.

* * * * *

Speech codes create a chilling environment where all
it takes is one accusation, true or not, to ruin
someone's academic career. The intent or reputation or
integrity of the accused is of little import. If
someone "perceives" you have said or acted in a racist
way, then the bar for guilt has been met. If a person
(footnote continued)

FILED, Clerk of the Appellate Division, November 18, 2019, A-002540-18, AMENDED

Turning to the New Jersey Policy at issue here, it is patently clear it violates the proscription against content and viewpoint-based speech restrictions. The Policy states in its opening paragraph: "Under this policy, forms of employment discrimination or harassment based upon the following protected categories are prohibited and will not be tolerated: race, creed, color, national origin, nationality, ancestry, age, sex/gender (including pregnancy), marital status, civil union status, domestic partnership status, familial status, religion,

10  affectional or sexual orientation, gender identity or expression, atypical hereditary cellular or blood trait, genetic information, liability for service in the Armed Forces of the United States, or disability." N.J.A.C. 4A:7-3.1(c). As noted in Saxe, by covering categories that go well beyond those covered under Title VII, the Policy infringes on 1st Amendment rights. Moreover, the reference to "creed" is equivalent to the reference to "values" criticized in Saxe. It is absolutely unconstitutional to discipline an employee for criticizing another employee's political beliefs, i.e., their creed.

20  Several of the provisions violate the requirement that prohibitions be content and viewpoint neutral, e.g.:

---

claims you caused them "harm" by saying something that offended them, case closed.

Id. at 80-81(notes omitted).

Treating an individual differently because of the
individual's race, color, national origin or other
protected category, or because an individual has the
physical, cultural or linguistic characteristics of a
racial, religious, or other protected category;

Treating an individual differently because of marriage
to, civil union to, domestic partnership with, or
association with persons of a racial, religious or
other protected category; or due to the individual's
membership in or association with an organization
identified with the interests of a certain racial,
religious or other protected category; or because an
individual's name, domestic partner's name, or
spouse's name is associated with a certain racial,
religious or other protected category;

Calling an individual by an unwanted nickname that
refers to one or more of the above protected
categories, or telling jokes pertaining to one or more
protected categories;

Using derogatory references with regard to any of the
protected categories in any communication;

N.J.A.C. 4A:7-3.1(b)

All of the above prohibitions flagrantly violate the 1st
Amendment free speech provision. They essentially make verbally
insulting a co-worker a basis for discipline, "up to and
including termination of employment." While it is true that
persistent, repeated verbal insults regarding some of the
protected categories can be subject to discipline for creating a
hostile workplace, one or two instances cannot, in of
themselves, be a basis for discipline where, as in R.A.V., only
speech that relates to the protected categories is punished, but
not "fighting words" unrelated to the protected categories.

## B.  The Policy Is Unconstitutionally Vague And Overbroad.

"[A] law forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process." Baggett v. Bullitt, 377 U.S. 360, 367(1964). Vague policies that apply to the exercise of free speech are unconstitutional because they do not alert citizens regarding what is permissible versus impermissible. Consequently, they chill speech by inhibiting its expression lest the speaker risk being penalized. In addition, vagueness "encourage[s] arbitrary and discriminatory enforcement" by those with the power of oversight over adherence to the regulation, increasing the "potential for arbitrarily suppressing First Amendment liberties." Kolender v. Lawson, 461 U.S. 352, 357-58 (1983). See Westbrook v. Teton County Sch. Dist. No. 1, 918 F. Supp. 1475 (D. Wyo. 1996) ("Staff Conduct" policy that stated "it shall be unethical for any staff member to criticize other staff members, the administrators, or members of the Board . . . to anyone other than the person being criticized" was void for vagueness because "criticism" is "an inherently imprecise term." Id. at 1490.)

The Policy's vagueness renders judgments regarding whether its terms have been violated susceptible to a degree of subjectivity that is constitutionally unacceptable. The Policy makes it a violation "to use derogatory or demeaning references

34

regarding a person's race, gender, age, religion, disability, affectional or sexual orientation, ethnic background, or any other protected category." These terms are so broad and vague, that they are not susceptible to objective enforcement. Query, if a professor comments that a colleague's receding hairline makes him look wise and distinguished, does that constitute a derogatory or demeaning reference to the person's age? If a professor states to his or her Italian male or female colleague that Latinos are known to be "hot" lovers, is that a derogatory

10   or demeaning ethnic or affectional reference warranting discipline? Do each of these examples turn on whether the recipient of the message is offended or not offended by the remark, so that if either statement is made to colleague A who is known as having a great sense of humor, and is not offended by either remark and does not file a complaint about the remark, the Policy has not been violated? But if either remark is made to colleague B, who, is self-conscious and retiring, and B is offended and files a complaint, is the speaker subject to discipline? What if the speaker calls colleague A as a witness,

20   and A testifies that s/he does not find either remark offensive, has the Policy been violated?

There are no objective guidelines in the Policy, and arguably no objective guidelines could be articulated which would remove the subjectivity, because subjectivity is unavoidably inherent

in the project, which is why the Policy is facially unconstitutional. The only guidelines are the examples provided, which themselves are vague. The Policy provides as an example, "Calling an individual by an unwanted nickname that refers to one or more of the above protected categories, or telling jokes pertaining to one or more protected categories." What if a student or professor says of a colleague who is 4' 9'' tall, "My diminutive friend here may be short in stature, but has a big heart," and the colleague does not like references to his/her

10  height, regardless its intent, has the Policy been violated, even on the first occurrence? Or is at least one warning required, e.g., "Please don't refer to my height, I don't like it," in order to render a second comment a violation?

What if a student or professor makes a joke to some friends relating to one or more of the protected categories, but no one within that protected category is within earshot, and none of the friends is offended, but a passerby who is not within the protected category overhears the joke and is offended, is it a violation of the Policy? Suppose no one overhears the joke, but

20  one of the friends repeats the joke to others, and one of them is offended, is the second instance a violation, but the first instance not a violation, since no one who might have been offended heard the firs instance?

In <u>Broadrick v. Oklahoma</u>, 413 U.S. 601 (1973), the Court

expounded on the application of the overbreadth doctrine in the context of the 1st Amendment, stating:

> Litigants . . . are permitted to challenge a statute not because their own right of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.
>
> Such claims of facial overbreadth have been entertained in cases involving statutes which, by their terms, seek to regulate "only spoken words" . . . . In such cases, it has been the judgment of this Court that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes.

Id. at 612 (citation omitted).

Numerous university speech codes have been held to violate the 1st Amendment on the basis of unconstitutional overbreadth. See McCauley v. Univ. of Virgin Islands, 618 F.3d 232 (3d Cir. 2010); Dejohn, supra; College Republicans, supra; Roberts, supra; Westbrook, supra; Doe v. Univ. of Mich., supra.

Many of the provisions in the Policy are simultaneously vague and overbroad. What does it mean, for example, to "treat" someone "differently" because the individual is within one of the protected categories? How does one tell if A is treating B differently than A treats C?  If A is Causcasian, B is Afro-American, and C is Caucasian, if A says "Hello" to C, but not to B, has A violated the Policy? What if A, a male, holds the door

37

open for female C, who is wearing a crucifix, but not for female B, who is wearing a hijab? Has A violated the Policy based on their different religions? The prohibition fails to give employees adequate notice of what is covered, and covers more than what could possibly be constitutionally defended.

The Sexual Harassment section of the Policy is likewise fatally afflicted with vagueness/overbreadth deficiencies, prohibiting "Generalized gender-based remarks and comments." If a male opines that, generally, women are smarter than men, has he violated the Policy? What if he says they are dumber, does this violate the policy, but not the former comment? The Policy prohibits "inappropriate comments about a person's clothing." If a male says to a female colleague that her dress brings out the beautiful amber in her eyes, has he violated the Policy? What if a female makes a *double entendre* remark to a male colleague about the length of his tie? Is typical flirting between genders prohibited? What female/male A finds flattering, female/male B may deem inappropriate and offensive.

**C.  The Policy Is So Permeated With Content/Viewpoint, Vagueness And Overbreadth Problems That It Is Not Salvageable.**

Virtually every provision in the Policy is unconstitutional by virtue of transgressing one or more of the strictures on content/viewpoint neutrality, vagueness or overbreadth. The Policy also violates Article 1, § 6 of the New Jersey

38

Constitution. "[T]his Court has recognized that our state Constitution may provide greater protection than the federal Constitution." <u>Right to Choose v. Byrne</u>, 91 N.J. 287, 301 (1982). <u>See also</u> <u>State v. Schmid</u>, <u>supra</u>.

The Policy does not contain a severability provision. Moreover, the unconstitutional provisions are "so pervasively woven into the entire regulatory program that [they] cannot be surgically removed." <u>In re Adoption of N.J.A.C. 5.96 and 5.97</u>, 215 N.J. 578, 618 (2013).[12]

10      Dr. Schuman may not be disciplined for purportedly violating an unconstitutional policy. The Policy's unconstitutionality vitiates the claim that Dr. Schuman committed religious discrimination against Dr. Tracey, as well as the claim – which Dr. Schuman disputes – that she commented on a student's name, accent and manner of speaking English. The New Jersey State Policy Prohibiting Discrimination In The Workplace is not salvageable and must accordingly be abrogated in its entirety, along with the disciplinary actions which were taken against Dr. Schuman based on her alleged violation of the Policy.

20

---

[12] <u>See also</u> <u>Affiliated Distillers Brands Corp. v. Sills</u>, 60 N.J. 342 (1972). Obviously, a state agency does not have authority to promulgate regulations that are unconstitutional. <u>Knight v. City, Hoboken Rent Leveling</u>, 332 N.J. Super. 547 (N.J. Super. App. Div. 2000).

39

FILED, Clerk of the Appellate Division, November 18, 2019, A-002540-18, AMENDED

## D.  Dr. Schuman Did Not Discriminate Against Dr. Tracey.

Putting aside questions regarding whether the comment in the email relating to "kapos" or about German Jews applied to Dr. Tracey as written, Dr. Schuman's comments did not constitute religious discrimination. First, the comments in question were not about Judaism as a religion. If anything, they were about national origin and ancestry. The final determination that Dr. Schuman discriminated against Dr. Tracey based on her religion therefore cannot be sustained.

Moreover, it distorts the concept of religious discrimination beyond recognition to claim that between two co-religionists, one can be guilty of religious discrimination against the other due to an insult. See Rabinovitz v. Pena, 89 F.3d 482 (7th Cir. 1996) (A religious discrimination claim under Title VII requires evidence that an employee "of a different religion" received more favorable treatment than the claimant.) Although it is conceivable that, for example, an Orthodox Jew who is a supervisor could make disparaging remarks to another Jewish employee who is Reformed, scoffing that the Reformed Jew was not sufficiently religious and therefore not really a Jew, unless the Orthodox Jew had taken an adverse employment action against the Reformed Jew, or made the disparaging remarks on a continuous basis so as to create a hostile work environment, a claim of religious discrimination under Title VII under such

40

FILED, Clerk of the Appellate Division, November 18, 2019, A-002540-18, AMENDED

circumstances would not be meritorious. See Abramson v. William Paterson College of N.J., 260 F.3d 265 (3d Cir. 2001).

In this case, neither of these conditions obtained. Schuman and Tracey were colleagues on an equal employment level; Schuman had no supervisory authority over Tracey and could not, and did not, take any adverse employment action against her. Nor did she threaten Dr. Tracey with physical violence, or commit any act of violence, against her. See United States v. Miller, 767 F.3d 585 (6th Cir. 2014) (Members of Amish community prosecuted for physically assaulting other members with whom they had ideological differences.)[13] Moreover, there was no significant difference in their religiosity such as would be the equivalent of the example above. In addition, the single insulting email could not constitute creating a hostile work environment, as a matter of law. As noted in Abramson, supra, 280:

> The Supreme Court has stated that Title VII is not violated by the "mere utterance of an ... epithet which engenders offensive feeling in an employee" or by mere "discourtesy or rudeness," unless so severe or pervasive as to constitute an objective change in the condition of employment.
>
> 260 F.3d at 280 (citing Faragher v. City of Boca

---

[13] See also Young v. Pleasant Valley Sch. Dist., 956 F. Supp.2d 589, 595 (M.D. Pa. 2013)(Hostile work environment claims should not turn Title VII into a "general civility code."); Cutler v. Dorn, 196 N.J. 419 (2008)(Jewish police officer sustained claim of religious discrimination under the Law Against Discrimination where he was subjected to repeated, virulently anti-Semitic comments by co-workers.)

_Raton_, 524 U.S. 775(1998). (citations omitted)).

By going beyond the parameters of what constitutes discrimination under Title VII, the Policy infringes on the free speech rights of public employees in the State of New Jersey. Since the Policy is facially unconstitutional and as applied to Dr. Schuman, none of the disciplinary actions that have been assessed against her on the putative basis that she violated the unconstitutional Policy can stand. One cannot be punished for
10    purportedly violating an unconstitutional policy which actually infringes on one's 1st Amendment free speech rights.

### POINT II

**SINCE THE NEW JERSEY POLICY IS UNCONSTITUTIONAL, THE COURT SHOULD RESCIND ALL DISCIPLINARY ACTIONS RELATED TO THE CHARGE THAT SHE VIOLATED THE POLICY.(This issue was not addressed below.)**

**A.    All Disciplinary Actions For Purportedly Violating The**
20    **Policy Must Be Rescinded Pursuant to 42 U.S.C. §1983, Since They Violated Her Free Speech And Due Process Rights.**

Dr. Schuman is a tenured professor. By virtue of that status, she possesses property and liberty interests that are protected under the 14th Amendment and Article I, Par. 1, of the New Jersey Constitution. _Loudermill_, _supra_; _Stachura_, _supra_; and _Nicoletta_, _supra_. In her August 27, 2018 letter to Dr. Schuman, which was designated as a "final determination" regarding the allegations lodged by Dr. Tracey, as well as all of the
30    allegations lodged by students in the EDUC 3400 course, Ms.

42

Kelley, writing as the Chief of Staff for University President

Farahi, stated:

> It is a violation of the State Policy to "use
> derogatory or demeaning references" with respect to
> protected categories covered by the policy, including
> religion, race, color, ethnicity, etc. Specifically, a
> review of your email dated February 1, 2018 to Dr.
> Tracey contained demeaning and derogatory references
> in violation of the State Policy. In addition, it was
> determined based on the information provided that your
> comments to a student enrolled in your Fall, 2017 EDUC
> 3400 class related to the student's name, accent, and
> manner of speaking English also constituted a
> violation the State Policy.
>
> In reviewing the information available, it was also
> determined that other issues reported by students,
> which included comments about Cubans and African
> Americans, did not constitute a violation of the State
> Policy. Finally, it was revealed that during the
> course of the investigation that other concerns were
> raised that did not implicate the State Policy.
> However, those concerns involve teaching methods and
> professionalism, and as such, they will be referred to
> the Office of Human Resources for appropriate action.

Pa59 (emphasis supplied).

The "final determination" did not indicate that any

disciplinary action was being imposed on Dr. Schuman. Despite

several attempts by Mr. Fagella to obtain a clarification of the

"final determination" from Ms. Kelly, Dr. Williams and Mr.

Green, the University refused to clarify that the determination

was what it said it was – a final decision and that no

additional action would be taken against Dr. Schuman.

Then, four months after the University issued its "final

determination," the University sent Dr. Schuman two letters,

43

dated January 14 and January 15, 2019, assessing disciplinary action against her.[14] By failing to include this information in its "final determination," the University violated Dr. Schuman's right to notice under the due process clause of the 14th Amendment. As stated in <u>Mullane v. Central Hanover Tr. Co.</u>, 339 U.S. 306, 314 (1950), the central purpose of a notice is to provide the recipient sufficient information in order to "choose for himself whether to appear or default, acquiesce or contest." The University's "final determination" was itself a notice regarding what, if any, infraction had been committed by Dr. Schuman and what the consequences of that infraction were. A significant consideration in making the decision whether to "acquiesce or contest" is the magnitude of the penalty if one does not contest. By failing to include in "the final determination" the disciplinary action that would be imposed for Dr. Schuman's violation of the Policy, the University deprived her of that critical information and is estopped from imposing it more than four months after the "final determination" was issued. The University's actions likewise violated Dr. Schuman's due process rights under Article 1, § 1 of the New Jersey

---

[14] Dr. Schuman disputes Mr. Green's claim that the Jan. 14 letter informing her that she was being given a non-teaching assignment for the Spring, 2019 term did not constitute disciplinary action. This claim will be addressed in the succeeding sub-argument.

Constitution. <u>See</u> <u>Greenberg v. Kimmelman</u>, 95 N.J. 552, 570-71 (1985)("Nowhere in that paragraph do the phrases 'equal protection' or 'due process' appear. Nonetheless, article 1, paragraph 1, like the fourteenth amendment, seeks to protect against injustice and against the unequal treatment of those who should be treated alike. To this extent, article 1 safeguards values like those encompassed by the principles of due process and equal protection.")

In the January 14, 2019 letter, the Director of the Office of Human Resources stated:

> A review of your conduct revealed that you made demeaning and/or derogatory religious-based comments <u>as well as offensive racial and/or ethnic references</u>. The State Policy prohibits the "use of derogatory or demeaning references" with respect to protected categories covered by the Policy. Not only was your behavior found to be in violation of the Policy, <u>but it also constitutes conduct unbecoming</u>.

> In addition, it was also alleged that you inappropriately implemented the Student Instructional Report II (SIR II) course surveys. After investigating this matter, the Office of Human Resources concluded that your conduct in distributing, conducting and collecting the surveys constituted a violation of the University's SIR II policy and guidelines.[15]

> The University takes these matters seriously and expects that all employees, students and prospective students are treated with dignity and respect. Accordingly, this is formal notification that the following disciplinary charges are being made against you:

---

[15]  SIR II refers to Student Instructional Reports that students prepare evaluating their professors.

45

>  1.   Conduct Unbecoming.
>  2.   Other Sufficient Cause:
>        a.   Violation of the *New Jersey*
>             *State Policy Prohibiting*
>             *iscrimination in the*
>             *Workplace* (a zero tolerance
>             policy)

10    Based upon the above facts, the following disciplinary
      action will be taken against you:

>  1.   This letter shall serve as an Official
>       written Reprimand.
>  2.   You will be required to complete an
>       Affirmative Action Programs training
>       delivered by the American Conference on
>       Diversity. You will be notified when the
>       course has been scheduled.

20    Pa33-34(emphasis supplied).


      Aside from violating Dr. Schuman's due process rights by

imposing discipline when the "final determination" indicated no

discipline was being imposed, Ms. Peters' letter violated due

process in several other respects. While the "final

determination" indicated the University had determined that the

students' allegations regarding Dr. Schuman's alleged comments

about Cubans and African-Americans did not constitute a

violation of the Policy, Peters' letter indicated these alleged

30    comments <u>did</u> violate the Policy, and proceeded to impose

discipline for those violations as well. Contradicting and

reversing the findings of the "final determination" without

prior notice and an opportunity to rebut the allegations

46

constituted an additional violation of Dr. Schuman's due process rights. As demonstrated above, moreover, the allegations Dr. Schuman had made ethnic and racial comments which violated the Policy could not be sustained where the Policy was itself unconstitutional.

The letter also added two additional charges, for which Dr. Schuman had never been given notice and an opportunity to be heard: the claim that she violated the SIR II policy, and the claim that her alleged violations of the Policy constituted

10  "conduct unbecoming." Regarding the "conduct unbecoming" charge, such a charge had never been raised in any of the letters or other documents which had been previously served on Dr. Schuman. Including this charge for the first time in Peters' letter violated due process. Mullane, supra. "It offends elemental concepts of procedural due process to grant enforcement to a finding neither charged in the complaint nor litigated at the hearing." Nicoletta, supra, 77 N.J. at 162. See also Navato v. Sletten, 560 F.2d 340 (8th Cir. 1977)(public hospital violated physician's due process rights by including in decision placing

20  him on probation charges that had not been previously raised at his hearing). Moreover, it could not be sustained where it was based on alleged violations of the Policy, where the Policy was

unconstitutional.[16]

---

[16] The charge that a public employee's actions constituted "conduct unbecoming" is unconstitutionally vague and cannot be sustained. In Bence v. Breier, 501 F.2d 1185 (7th Cir. 1974), the court held that the reprimand of two police officers for having engaged in "conduct unbecoming a member and detrimental to the service" was properly overturned by the trial court because the charge was unconstitutionally vague. The Court stated:

> [I]t is well-settled that the prohibition against vagueness extends to administrative regulations affecting conditions of governmental employment as well as to penal statutes, for the former may be equally effective as a deterrent to the exercise of free speech as the latter.

> * * * * *

> [E]ven though the phrase "conduct unbecoming an officer and a gentleman" has attained a fixed and certain content in the military which is constitutionally sufficient to withstand an attack on vagueness grounds, it does not follow that that content is transferable to civilian police department rules incorporating the same language. None of the military precedents or military authorities has application in a civilian context, and the longstanding customs and usages, which have developed historically in the military, are unfamiliar to nonmilitary personnel. Moreover, "[t]he fundamental necessity for obedience, and the consequent necessity for imposition of discipline," which "differentiate military society from civilian society" and which permit Congress "to legislate both with greater breadth and with greater flexibility when proscribing the rules by which the former shall be governed than . . . when prescribing rules for the latter," . . . is less exigent in a civilian police context.

> * * * * *

> Clearly, [the] definition [of conduct unbecoming] is vague, as the proscribed conduct is phrased in such generalities as to leave the policeman bereft of any

(footnote continued)

Regarding the alleged SIR II violation, no such charge was raised in Dr. Williams' letter or the "final determination." Dr. Schuman had absolutely no prior notice that such a charge was being leveled against her and did not have an opportunity to address it.

Consequently, both of the disciplinary actions which were imposed in Ms. Peter's letter must be rescinded and expunged from Dr. Schuman's record. Since the letter has been designated as an Official Written Reprimand, it must be expunged, since it includes references to unsustained charges that Dr. Schuman violated the Policy and engaged in conduct unbecoming, as well as references to two charges for which she was not provided any notice, in violation of her due process rights. Moreover, the disciplinary actions included in the letter clearly do not relate to the alleged violation of the SIR II policy, since that

_____

ascertainable standard with which to guide his conduct. .... "[C]onduct unbecoming" presents a standard "so impalpable as to be no standard at all[.]"

Id. at 1188, 1192-93 (citations omitted).

See also Hamtramck Civil Serv. Comm'n v. Pitlock, 205 N.W.2d 293 (Mich. 1973); Sponick v. City of Detroit Police Dept., 211 N.W. 2d 674 (Mich. 1973).

If a charge of "conduct unbecoming" is unconstitutionally vague in the context of a police department, a fortiori it is unconstitutionally vague in the context of an academic community of tenured professors.

alleged infraction could not qualify as "conduct unbecoming" and did not constitute a violation of the Policy.

While Dr. Schuman has already been required to participate in the diversity training (despite Dr. Schuman's motion to have the training stayed), the requirement should be rescinded retroactively and any reference to it expunged from her personnel file.

**B. The Non-Teaching Assignment Constituted A Disciplinary Action And Was Imposed Based On The Claim That Dr. Schuman Had Violated The Policy And Must Accordingly Be Rescinded.**

By letter dated January 14, 2019, Dr. Toney informed Dr. Schuman that she was being given a non-teaching assignment for the 2018 Spring term, in lieu of her teaching the courses she was scheduled to teach. Pa35. The University's claim that the non-teaching assignment did not constitute disciplinary action for the alleged violation of the Policy is specious. Pursuant to the non-teaching assignment, the classes which Dr. Schuman was scheduled to teach were taken away from her. The non-teaching assignment imposed on her in January 2019, required that she do research in the University library according to a schedule of weekly assignments. She was required to sign in when she arrived at work, and sign out when she departed, as if she were a custodian, rather than a tenured professor of 50 years experience. The assignment was clearly designed as punishment to

insult and humiliate her and probably force her to retire.[17]

The claim that the assignment was not related to the charge that Dr. Schuman had violated the Policy is likewise without merit. The assignment was made a mere four months after the "final determination" that she had violated the Policy was sent to her on August 26, 2018. It was made less than two weeks after the Director of Civil Service denied reconsideration of the decision to decline jurisdiction. A copy of the Director's letter was sent to Dr. Williams. The non-teaching assignment was issued one day before Ms. Peters sent Dr. Schuman her letter indicating that disciplinary action was being imposed for Dr. Schuman's alleged violation of the Policy. The temporal proximities and the context of the non-teaching assignment demonstrate that it was causally connected to the University's determination that she had violated the Policy and was punishment for that alleged violation. Since the Policy was unconstitutional, the non-teaching assignment, like the other disciplinary actions taken against Dr. Schuman, was also unconstitutional.

In this regard it is irrelevant that during the non-teaching assignment Dr. Schuman's income was not reduced. It is

---

[17] Dr. Schuman's age is undoubtedly a factor which plays into this drama. She is 80 years old and has been teaching at the university level for more than 50 years.

51

well established that retaliation for a public employee's exercise of the employee's 1st Amendment rights violates the Constitution, regardless whether the employee has or does not have a property right in their employment, or whether any property right is affected. In Mt. Healthy City Bd. of Educ. v. Doyle, 428 U.S. 274(1977), the Supreme Court accordingly observed that:

> [Respondent's] claims under the First and Fourteenth Amendments are not defeated by the fact that he did not have tenure. Even though he could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him . . . he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms.

> Id. at 283 (citations omitted.).

In Romano v. Brown & Williamson Tobacco, 284 N.J. Super.543 (App. Div. 1995), this court discussed the kind of evidence which is necessary to prove that an employment action is retaliatory, stating:

> Clearly, causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive. While the cases note protected conduct that is closely followed by the adverse action . . . we find no case that stands for the proposition that proximity is the only circumstance that justifies an inference of causal connection.

> Id. at 550 (citations omitted).

Discussing the same issue, the court in Jean v. Deflaminis, 480 F.3d 259 (3d Cir. 2007), stated:

> To establish the requisite causal connection a
> plaintiff usually must prove either (1) an unusually
> suggestive temporal proximity between the protected
> activity and the allegedly retaliatory action, or (2)
> a pattern of antagonism coupled with timing to
> establish a causal link.

> Id. at 267 (citations omitted).

This interplay between temporal factors and a pattern of

10  antagonism as the basis for inferring causality was reiterated

in Watson v. Rozum, 834 F.3d 417 (3d Cir. 2016), where the court

observed:

> [Appellant] can establish the third element of a *prima
> facie* case of retaliation with evidence of: (1) an
> unusually suggestive temporal proximity between the
> protected activity and the allegedly retaliatory
> action, or (2) a pattern of antagonism coupled with
> timing to establish a causal link. However, "the
> timing of the alleged retaliatory action must be
> 20  'unusually suggestive' of retaliatory motive before a
> causal link will be inferred." Moreover, causation,
> like any other fact, can be established from the
> evidence gleaned from the record as a whole. "[W]here
> the temporal proximity is not so close as to be
> 'unduly suggestive,'" the appropriate test is "timing
> plus other evidence." (Footnotes omitted.)

> Id. at 424.[18]

The facts strongly support the conclusion, notwithstanding

30  the University's denial, that the University imposed the non-

teaching assignment on Dr. Schuman because it had determined –

---

[18]  See also Conrad v. Pennsylvania State Police, 902 F.3d 178,
183 (3d Cir. 2018); Marra v. Philadelphia Housing, 497 F.3d 286,
302 (3d Cir. 2007); Bass v. Bd. of County Comm'ns, 256 F.3d
1095, 1119 (11th Cir. 2001); Rogers v. Alternative Resources
Corp., 440 F. Supp.2d 366, 377 (D.N.J. 2006).

erroneously – that she had violated the Policy. Barely four months transpired between the "final determination" that she had violated the Policy and the imposition of the non-teaching assignment. Moreover, although the "final determination" did not assess any disciplinary action against Dr. Schuman, the assignment was imposed less than two weeks after Mr. Meyers definitively denied that the Commission had jurisdiction over her appeal, giving the University free rein to now impose discipline with Dr. Schuman having no immediately obvious appellate recourse. The non-teaching assignment was imposed the day before Ms. Peters sent the letter imposing disciplinary actions for her alleged violation of the Policy. The temporal sequence of events, combined with the pattern of antagonism in Ms. Peter's letter evidenced by the surprise charges of an SIR II violation and a "conduct unbecoming," fortify the causal connection between the alleged violation of the Policy and the imposition of the non-teaching assignment.

The fact that the non-teaching assignment did not entail a reduction in Dr. Schuman's salary does not defeat the claim that the assignment was imposed as punishment for her alleged violation of the Policy. The assignment was clearly a demotion in status and prestige. As the Court stated in Bass, supra, "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that

54

FILED, Clerk of the Appellate Division, November 18, 2019, A-002540-18, AMENDED

alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." 256 F.3d at 1118.

In Thomson v. Belton, 2018 WL 6173443 (D. Md. Nov. 26, 2018), Pa105, the plaintiff was employed as a public information officer for the Maryland Department of Natural Resources. When she was reassigned and deprived of her media-related job duties, she sued, claiming the reassignment was a retaliatory employment
10   action attributed to her having posted a critical remark on Facebook regarding a gubernatorial candidate. Her employer denied the claim, contending that the reassignment was not an adverse employment action, because she retained her salary and was not demoted. The Court rejected the defense, stating:

> Plaintiff contends that her reassignment is an adverse, retaliatory employment action that violated her First Amendment rights. She claims that "she was removed from her responsibilities" and was assigned to "college-level intern duties."

20
>                      *  *  *  *  *

> Defendant responds that plaintiff was not "demoted or punished," nor "stripped of the bulk of her responsibilities," nor "removed from the daily flow of activity" . . . He also maintains that plaintiff's role was not reduced to "clerical duties" . . . According to the defense, much of plaintiff's job remained unchanged, including her pay, status as a
30 > full-time employee, job classification, class title, personal identification number, and working conditions.

55

* * * * *

"[T]he nature of the retaliatory acts committed by a public employee" only needs to "be more than *de minimis* or trivial" . . . As noted earlier, a reassignment "need not result in a decrease in pay, title, or grade" to constitute an adverse employment action . . . A demotion can suffice "if the new position proves objectively worse – such as being less prestigious or less interesting or providing less room for advancement."

* * * * *

Plaintiff clears this standard. Previously, and central to her duties, she had direct contact with the press. But, on reassignment, she was prohibited from such interaction. ... Once a "lead worker," she was reduced to a support role. Once responsible for eight types of decisions, plaintiff was later responsible for only two. ... [Her] newer role was clearly "less prestigious" and "less interesting" . . . As [she] put it in her testimony, "My previous job was a Porsche and the job I have now is a Yugo."

Id. at *21 (citations omitted).[19]

---

[19]   See also Love-Lane v. Martin, 355 F.3d 766, 779 (4th Cir. 2004)("[Appellant's] transfer or reassignment, which was a demotion in duties and responsibilities, qualifies as an adverse employment action for purposes of her free speech claim."); Head v. Chicago Sch. Reform Bd., Trustees, 225 F.3d 794, 803 (7th Cir. 2000) ("[E]ven if [Appellant] did receive all he would have been due had he remained ... principal, he might still have had a constitutionally protected property interest in remaining in that position. We have recognized that a loss of position that impedes future job opportunities or has other indirect effects on future income can inflict an actionable deprivation of property."); Sharp v. City of Houston, 164 F.3d 923, 933 (5th Cir. 1999) ("Employer actions that can result in liability include more than just actual or constructive discharge from employment. Adverse employment actions can include discharges, demotions, refusals to hire, refusals to promote, and reprimands." Footnote omitted.); Levin v. Harleston, 966 F.2d 85, 88 (2d Cir. 1991) ("In addressing the issue of the 'shadow (footnote continued)

56

The non-teaching assignment was clearly an adverse employment action, notwithstanding it did not entail a reduction in salary. It constituted a substantial demotion in status, converting Dr. Schuman from a tenured professor teaching college students the methodologies for teaching children how to read to the equivalent of a college intern, assigned to do research in the library and write summaries of her research, to be reviewed by an administrative supervisor. It was intended to humiliate and punish her, and was causally linked to her alleged violation of the unconstitutional Policy. The non-teaching assignment consequently violated Dr. Schuman's 1st Amendment rights. Since it has been completed, it cannot be undone. but it must be retroactively rescinded and expunged from her record.

10

_____

classes', we emphasize the great reluctance with which this court intrudes upon the decisions of a university administration. ... Where, however, basic constitutional values have been infringed, this court will not remain silent. '[S]tate colleges and universities are not enclaves immune from the sweep of the First Amendment." Citations omitted.); Rutan v. Republican Party of Illinois, 868 F.2d 943, 954, note 4 (7th Cir. 1989) ("[E]ven an act of retaliation as trivial as failing to hold a birthday party for a public employee could be actionable when intended to punish her for exercising her free speech rights."); Hughes v. Whitmer, 714 F.2d 1407, 1421 (8th Cir. 1983), cert. denied, 465 U.S. 1023 (1984) ("[A] transfer traceable to speech-related activity is properly the subject of first amendment challenge, even though the transfer result(s) in no loss of pay, seniority, or other benefit."); Walsh v. Sto-Rox Sch. Dist., 532 A.2d 547 (Pa. Commw. Ct. 1987) ("A demotion is a reassignment to a position which has less importance, dignity, authority, prestige or salary.")

**C.    If The Non-Teaching Assignment Was Not Related To The Alleged Violation Of The Policy, Then It Violated Dr. Schuman's Liberty Interest And Procedural And Substantive Due Process Rights.**

The University's imposition of the non-teaching assignment was either related to its determination that Dr. Schuman violated the Policy, or it was not related. If it was related, as the temporal and other circumstances surrounding the

10    assignment strongly indicate, the University violated Dr. Schuman's 1st Amendment rights.

Assuming, _arguendo_, however, that it was not related, as the University maintains – a contention which Appellant regards as highly questionable given the sequence of events - then the University violated Dr. Schuman's property and liberty interests without having provided her with a due process hearing. In Bd. of Regents v. Roth, 408 U.S. 564 (1972), Wisconsin State University failed to renew the contract of a non-tenured assistant professor. Since the professor did not have a property

20    interest in his employment, the Court held he was not entitled to a deprivation of property pre-termination due process hearing under the 14th Amendment. Dr. Schuman, by contrast, as a tenured professor, does have a property interest in her continued employment. In Roth, moreover, the Court recognized that although a public employee may not have a property right protected by the requirements of due process, the employee may

58

have a liberty interest protected against infringement under the

14th Amendment, stating:

> "Liberty" and "property" are broad and majestic terms.
> They are among the "[g]reat [constitutional] concepts
> . . . purposely left to gather meaning from experience
> . . .[T]hey relate to the whole domain of social and
> economic fact, and the statesmen who founded this
> Nation knew too well that only a stagnant society
> remains unchanged." For that reason, the Court has
> fully and finally rejected the wooden distinction
> between "rights" and "privileges" that once seemed to
> govern the applicability of procedural due process
> rights. The Court has also made clear that the
> property interests protected by procedural due process
> extend well beyond actual ownership of real estate,
> chattels, or money. By the same token, the Court has
> required due process protection for deprivation of
> liberty beyond the sort of formal constraints imposed
> by the criminal process.

Id. at 571-72 (footnotes and citations omitted).

The Court proceeded to evaluate whether the professor's

liberty interest had been compromised and concluded that it had

not, stating:

> The State, in declining to rehire the respondent, did
> not make any charge against him that might seriously
> damage his standing and association in his community.
> It did not base the nonrenewal of his contract on a
> charge, for example, that he had been guilty of
> dishonesty, or immorality. Had it done so, this would
> be a different case. For "[w]here a person's good
> name, reputation, honor, or integrity is at stake
> because of what the government is doing to him, notice
> and an opportunity to be heard are essential" . . . In
> such a case, due process would accord an opportunity
> to refute the charge before University officials. In
> the present case, however, there is no suggestion
> whatever that the respondent's "good name, reputation,
> honor, or integrity" is at stake.

Id. 573-74.

Here, Dr. Schuman's "good name, reputation, [and] honor" have been compromised by the character of the non-teaching assignment the University has arbitrarily imposed on her, with no explanation or rationale – other than the only explicable rationale discussed in the prior sub-argument, that it was punishment for allegedly violating the Policy. Absent that explanation, there is no rational basis for the University depriving her of the classes she was scheduled to teach, and relegating her to the library to do the research that would ordinarily be assigned to a college intern. Dr. Schuman's visible daily presence in the library, rather than in a classroom, and the knowledge that she was not teaching any classes, has adversely affected her academic reputation and infringed on her liberty interest. See Williams v. Civil Service Comm'n, 66 N.J. 152 (1974) (termination of Assistant Dog Warden, who held only a provisional appointment and therefore had no property interest in his employment, without a due process hearing violated his liberty interests under the U.S. Constitution.)

"It is not without significance that most of the provisions of the Bill of Rights are procedural. It is procedure that spells much of the differences between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal

justice under law." Joint Anti-Fascist Committee v. McGrath, 341
U.S. 123, 179 (1951) (Douglas, J. concurring). The University,
being public institution, is not free to demote a tenured
professor by ipse dixit, with no explanation and no provision
for a due process hearing.[20] In Smock v. Bd. of Regents, 353 F.
Supp. 3d 651 (E.D. Mich. 2018), a tenured professor of Sociology
was accused by students of making inappropriate jokes and
discussing her sexual activities during research meetings with
students. After an Executive Committee conducted an
10  investigation, the Committee froze her salary for three years;
denied her the opportunity to take sabbatical leave; precluded
her from serving as the primary advisor of doctoral students;
and prohibited her from meeting with students outside

---

[20]  Nor can the University justify its conduct by claiming that
the Collective Negotiation Agreement between it and Dr.
Schuman's union allowed it to act as it did. First, as noted
above, note 3, Kean violated the CNA by imposing the non-
teaching assignment without first conferring with the union, as
Article XII(B)(7) unequivocally required it to do. Moreover, as
noted above, the kind of non-teaching assignment which Dr.
Schuman had been given in the past involved comparable
administrative duties in which she supervised a reading program
related to her teaching experience and scholarship, not
performing the research functions of a college student. The
assignment she was given violated her liberty interest. Such a
constitutional violation cannot be immunized from attack by
enshrining it in a CNA. The employer and the union cannot
collaborate to allow a violation of the law in the guise of
collective bargaining. A CNA cannot waive enforcement of an
employee's legal rights. See Alexander v. Gardner-Denver Co.,
415 U.S. 36 (1974); Hawaiian Airlines, Inc. v. Norris, 512 U.S.
246 (1994); Thornton v. Potamkin Chevrolet, 94 N.J. 1 (1983).
Any provision in a CNA which purports to do so is null and void.

professional settings. She filed a grievance and the Grievance
Hearing Board affirmed the discipline. The professor filed suit,
alleging that she had a property interest in her right to a
sabbatical and serving as a graduate student advisor and had not
been afforded an adequate due process hearing. Denying the
defendants' motion to dismiss the complaint, the court stated:

> If restriction on Plaintiff's interactions with
> graduate students are only changes in job duties, her
> claim must be dismissed, for one does not have a
10 > property interest in one's job duties. Plaintiff has
> adequately alleged, however, that her role as an
> advisor to graduate students is necessary to her
> scholarship and her standing in the academic
> community. A change of job duties can be something
> much more when it both stigmatizes the employee and
> forces her to work beneath her station. The Sixth
> Circuit has held that a demotion may touch upon a
> constitutionally protected property right, but "the
> contours of that interest depend, of course, on the
20 > terms of the contract."

                              * * * * *

> Plaintiff has therefore pled the deprivation of a
> constitutionally protected property interest in her
> sabbatical leave and graduate student mentorship. The
> question then becomes whether the process provided by
> the University is sufficient.

30                           * * * * *

> "The fundamental requirement of due process is an
> opportunity to be heard at a meaningful time and in a
> meaningful manner."

                              * * * * *

> Plaintiff had many opportunities to be heard in this
> case, but none were meaningful. Plaintiff was cleared
40 > of sexual harassment charges . . . She was then
> retried . . . and given only the chance to submit

further documentation in writing . . . Neither party
can identify the standard of review by which the GHB
evaluated . . . the decision. Whether or not the GHB
could even constitute a meaningful opportunity to be
heard thus remains to be discovered.

Id. at 657 (citations omitted, emphasis supplied).

Dr. Schuman has never had an opportunity "to be heard at a
meaningful time and in a meaningful manner" regarding the
10  University's imposition of the non-teaching assignment, which
has stigmatized her standing in the academic community. Even
assuming, arguendo, that the non-teaching assignment was
unrelated to her alleged violation of the Policy, the University
has violated her procedural due process rights by not explaining
why she was given the assignment and affording her an
opportunity to be heard in rebuttal.

In Goss v. Lopez, 419 U.S. 565 (1975), the Supreme Court
held that nine students who were temporarily suspended from high
school were entitled to a hearing either prior to their
20  suspension, or shortly thereafter, stating:

Appellees were excluded from school only temporarily,
it is true, but the length and consequent severity of
a deprivation, while another factor to weigh in
determining the appropriate form of hearing, "is not
decisive of the basic right" to a hearing of some kind
. . . The Court's view has been that as long as a
property deprivation is not de minimis, its gravity is
irrelevant to the question whether account must be
taken of the Due Process Clause . . .A 10-day
30  suspension from school is not de minimis in our view
and may not be imposed in complete disregard of the
Due Process Clause.

63

Id. at 576 (citations omitted).

Dr. Schuman was deprived of her classes for an entire semester, with no explanation other than that was what her employer wanted. She was relegated to the ignominy of being seen working in the library on a daily basis. By so acting, the University violated Dr. Schuman's liberty interest under the 14th Amendment. It also violated her rights under Article 1, par. 1 of the New Jersey Constitution. In John Doe v. Poritz, 142 N.J.

10   1 (1995), our Supreme Court held that the New Jersey Constitution provided broader protection of citizens' reputation than is afforded by the 14th Amendment, stating:

> Under the State Constitution, we find protectible interests in both privacy and reputation. Our analysis differs from that under the Federal Constitution only to the extent that we find a protectible interest in reputation without requiring any other tangible loss. In interpreting the State Constitution, we "look to both the federal courts and other state courts for assistance . . .[but] [t]he ultimate responsibility
20 > for interpreting the New Jersey Constitution . . . is ours" . . . In fulfilling that responsibility, "we have generally been more willing to find State-created interests that invoke the protection of procedural due process than have our federal counterparts."
>
> * * * * *
>
> The New Jersey Constitution does not explicitly enumerate the right to possessing or protecting
30 > reputation. That right, however, was understood to be guaranteed by Article I, paragraph 1 of the Constitution of 1844. The right of a person to be secure in his reputation . . . is a part of the right of enjoying life and pursuing and obtaining safety and happiness which is guaranteed by our fundamental law" . . . []"The Constitution of New Jersey deals with

> [the right to personal privacy and security] in Art. I, plac. 1. The immunity 'consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation.'" Where a person's good name or reputation are at stake because of what the government is doing to that person, we conclude, sufficient constitutional interests are at stake.

10   Id. at 104 (citations omitted, emphasis supplied).

In Donaldson v. Bd. of Ed. of No. Wildwood, 65 N.J. 236 (1974), a non-tenured teacher was told that her contract would not be renewed. "She was not told why and though she persistently sought the reason or reasons from the Superintendent, and from the board which confirmed his action, she has been unable to obtain any pertinent disclosure." Id. at 238. The New Jersey Supreme Court held that she was entitled to an explanation, stating: "We have on many occasions insisted on procedural safeguards against arbitrary or unjust action though there may then have been no comparable safeguards in the federal

20   sphere." Id. at 243. Dr. Schuman filed a grievance against the University, seeking an explanation for the University's imposition of the non-teaching assignment, without even conferring with her union, as clearly required by the CNA. The University denied the grievance and the union has refused to take the issue to arbitration. Notwithstanding, under the New Jersey Constitution, Dr. Schuman is entitled to an explanation.

The University's conduct also violated substantive due

FILED, Clerk of the Appellate Division, November 18, 2019, A-002540-18, AMENDED

process under the 14th Amendment. In <u>Salerno v. O'Rourke</u>, 555 F.
Supp. 750 (D.N.J. 1983), the plaintiff was a Deputy Warden in
the Camden County Jail. After he submitted a report to his
supervisor alleging that there were overtime and double salary
abuses in the department, and made recommendations for
increasing efficiency and reducing waste, he was subjected to a
series of harassing employment actions by the sheriff:

> Plaintiff was continuously subjected to changes in the
> hours and places of employment, curtailment of his
> duties and responsibilities as Deputy Warden,
> suspensions without pay without first being charged
> with a specific offense, and the untimely filing of
> charges for alleged past offenses, without notice and
> without any opportunity to defend his reputation as a
> public employee or challenge the gradual erosion of
> his duties and responsibilities. Defendant argues that
> plaintiff could not have been deprived of due process
> because "there exists [no] procedural or
> administrative system for changes in job assignments
> and the like."

* * * * *

> The Court finds defendant's argument unpersuasive.
> Assuming it is true that no applicable administrative
> procedures exist, the lack of an adequate system to
> provide public employees with minimum procedural
> requirements violates the Due Process Clause just as
> much as the failure to comply with the terms of an
> existing system. Moreover, the proper focus when
> determining if due process requirements apply is not
> on the existence or non-existence of administrative
> procedures, but on the nature of the interest at stake
> . . . As the Court in *Goss* held, "as long as a
> property interest is not *de* m*inim[i]s*, its gravity is
> irrelevant to the question whether account must be
> taken of the Due Process Clause.

* * * * *

FILED, Clerk of the Appellate Division, November 18, 2019, A-002540-18, AMENDED

> The dictates of procedural due process require, at a minimum, fair notice and an opportunity to prepare and respond at a meaningful time. ... For the foregoing reasons, this Court finds that plaintiff was not accorded the due process protection to which he is entitled. (Citations omitted.)

> Id. at 760-61.

The Court proceeded to analyze the plaintiff's substantive

10   due process claims, saying:

> Claims of substantive due process violations ordinarily arise in the context of attacks on state legislation which arbitrarily or unreasonably deprives a claimant of a protected interest. The Supreme Court standard of review in such cases is to presume that the legislation is valid unless claimant can show that the aim it seeks to achieve is not a legitimate state interest, or that it is not rationally related to a legitimate state goal.

20
> * * * * *

> In the case presently before this Court, plaintiff does not allege that he has been deprived of substantive due process by arbitrary or unreasonable state legislation. Instead, he alleges that by curtailing his duties and responsibilities as Deputy Warden, defendant arbitrarily and capriciously forced him into a de facto demotion, without compliance with
30   > his procedural rights. Plaintiff contends that defendant offers no rational basis for his actions, and shows no connection to any legitimate state interest in depriving him of the indicia of his position. He contends that these actions violate both state law, which prohibits a public employee from being assigned duties other than those pertaining to the position he legally holds ... and federal law, under the substantive due process guarantees of the Fifth and Fourteenth Amendments.

40
> It has been held that, in the context of public employment cases, "there is no separate, independent 'liberty' interest in being free from arbitrary and capricious governmental action . . . the governmental

conduct must deprive the plaintiff of some otherwise recognizable life, liberty or property interest before the plaintiff can recover" . . . Plaintiff here satisfies this threshold requirement, because in our earlier discussion of his procedural due process claim, we found that he had established a cognizable property interest in his position as Deputy Warden. Therefore, <u>the appropriate test to be applied here is whether defendant's actions, under color of state law, arbitrarily and capriciously infringed on plaintiff's protected interest in a way that was not rationally related to the attainment of legitimate governmental objectives</u>.

\* \* \* \* \*

The cumulative incidents of harassment, abuse, and reprisal established at trial sustain a finding by the Court that defendant did in fact deprive plaintiff of the powers and indicia of his position as Deputy Warden, in violation of his constitutional right to substantive due process.

<u>Id</u>. at 761-63 (citations omitted, emphasis supplied).

Under the University's view of the scope of its managerial authority, it had the right by ukase – without explanation or a hearing - to convert Dr. Schuman from a professor teaching classes to, if it wished, a scullery maid assigned to cleaning the restrooms, as long as it continued to pay her the same salary. Neither the United States Constitution nor the New Jersey Constitution grants a public employer such unfettered power. Therefore, even if, as the University claims, its imposition of the non-teaching assignment was not connected to its determination that she violated the Policy, the University violated Dr. Schuman's liberty interest and her procedural and

substantive due process rights.

**D.  Imposing The Non-Teaching Assignment Without Charges Or A Hearing Violated The New Jersey Teacher Tenure Act.**

The New Jersey Teacher Tenure Act states, in relevant part,

N.J.S.A. 18A:6-18:

> No professor, associate professor, assistant professor, instructor, supervisor, registrar, teacher or other persons employed in a teaching capacity, in any State college, county college or industrial school who is under tenure during good behavior and efficiency shall be dismissed or subject to reduction of salary, except for inefficiency, incapacity, conduct unbecoming a teacher or other cause. Written charge of the cause or causes preferred against an individual shall be signed by the person or persons making the same and filed with the board of trustees of said college or school. Upon determination that the matter is a contested case, the board shall assign the matter of hearing and initial decision to the Office of Administrative Law. A final decision shall be rendered by the full board of trustees. The person charged may be represented by counsel at all times and have compulsory process to compel the attendance of witnesses to testify therein, as provided by law. Contested case hearings shall be conducted under rules and regulations established pursuant to the "Administrative Procedure Act[.]"

"Tenure is created by a statute ... which should be liberally construed to further its beneficial purpose of affording security to teaching staff who meet its standard of length of service." Bednar v. Westwood Bd. of Educ., 221 N.J. Super. 239, 241 (App. Div. 1987) (citation omitted, emphasis supplied).

There is no definition of the word "dismissed" in the Act. While it does not appear that there are any New Jersey cases,

published or unpublished, which define the word "dismissed" as used in the Act, several other states have defined the word as applied in their statutes to include "demotion." In Hansen v. Bd. of Educ., 502 N.E.2d 467 (Ill. Ct. App. 1986), an instrumental music teacher claimed he had been unlawfully dismissed without a hearing. When parents complained to the school superintendent regarding the band's performance under the teacher's stewardship, the school board authorized the superintendent to retain a new band director and to assign the

10  plaintiff nonteaching duties, while keeping his salary at the same level. Thereafter, the plaintiff no longer developed lesson plans for students. Instead, he was assigned to watch students embarking and disembarking from school buses and to monitor the students in study hall. He sued, contending that his non-teaching assignment constituted a removal or dismissal under the relevant Illinois statute, and that he was therefore entitled to an evidentiary hearing to justify the assignment, which had not been provided. The trial court dismissed the lawsuit, and the appellate court reversed, stating:

20      [T]he total deprivation of teaching responsibilities
        and assignments is the equivalent of dismissal under
        the [Act]. By its actions, the board of education had
        effectively dismissed the plaintiff, and it is thereby
        bound to follow the procedures prescribed by [the
        Act].

70

Id. at 986 (citations omitted).[21]

Dr. Schuman has a Ph.D. in literacy and reading. For 50 years she taught classes at Kean in literacy and reading, as well as supervised the University's reading clinic. Being demoted to the equivalent of a college intern, without an explanation and without a hearing, constituted a dismissal under the New Jersey Teacher Tenure Act, the purpose of which is to "afford[] security to teaching staff." The University's failure to comply with the procedures required under the Act was

---

[21] See also Ng v. State Personnel Bd., 68 Cal. App. 3d 600, 606; (Cal. Ct. App. 1977)("In our view the procedural due process doctrine ... extends to demotions as well as dismissals. In a practical sense a permanent employee's property interest in continued employment embraces his current classification as well as his current salary. His property interest is damaged by demotion as well as dismissal." Citation omitted.); Mitchell v. Board of Trustees, 42 P.2d 397 (Cal. Ct. App. 1935) ("While a board would have no right to evade the plain meaning of the tenure act by assigning a teacher to a class of work for which he was not qualified, for the purpose of compelling his resignation, it has the power to reasonably change assignments with respect to a permanent teacher so long as the work assigned is of a rank and grade equivalent to that by which the permanent status was acquired and so long as the assignment is one for which the teacher in question is qualified." (emphasis supplied)); Setterlund v. Groton-Dunstable Regional School Comm., 415 N.E.2d 214 (Mass. 1981) ("It has been held that a complete separation from the schools is a 'dismissal' . . . although this is not the exclusive definition of 'dismissal.' We have held, for example, that for a teacher to be 'dismissed' he need not be wholly banished from the school system, it being sufficient if he is excluded from the job or category of teacher." (citation omitted)).

unlawful.[22] The non-teaching assignment should accordingly be rescinded retroactively and expunged from Dr. Schuman's record.

## POINT III

**THE COMMISSION'S POSITION THAT IT DOES NOT HAVE JURISDICTION OVER DR. SCHUMAN'S APPEAL IS INCONSISTENT WITH THE LANGUAGE OF THE POLICY, CONTRARY TO PROVISIONS IN THE NEW JERSEY CIVIL SERVICE ACT, AND VIOLATES EQUAL PROTECTION. (Part of this claim, relating to the language of the Policy, was raised below.)**

10

On appeal, Appellant bears the burden of demonstrating that the Commission's action "was arbitrary, capricious or unreasonable." A.B. v. Div. of Med. Assistance, 407 N.J. Super 330, 339 (App. Div. 2009). In making that evaluation, the Court explained the scope of its review, observing that:

> [While] "[i]t is settled that '[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference[,]' . . . we
> 20 are not bound by the agency's legal opinion" . . . Statutory and regulatory construction is a purely legal issue subject to de novo review.
>
> "[A] rule of an administrative agency is subject to the same canons of construction as a statute" . . . N.J.S.A. 1:1-1 provides general instructions for judicial construction of statutes and laws in New Jersey:
>
> 30 In the construction of laws and statutes of this state, both civil and criminal, words and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of

---

[22] This is so notwithstanding the provision in the CNA authorizing the University to issue non-teaching assignments, predicated on the University having first conferred with the union. The union may not waive the Tenure Act rights of its members. Alexander, Thornton, supra.

the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language.

Therefore, when a court is called upon to review a statute, determining the Legislature's or the agency's intent is the paramount goal and, generally, the best indicator of that intent is the statutory or regulatory language itself . . . We begin with the words of the statute or regulation and ascribe to them their ordinary meaning. . . . We will read the words in context with related provisions so as to give sense to the legislation or regulatory scheme as a whole . . . "It is not the function  of [a reviewing court] to 'rewrite a plainly-written enactment of the Legislature []or presume that the Legislature intended something other than that expressed by way of the plain language'" . . . We "cannot 'write in an additional qualification that the Legislature pointedly omitted in drafting its own enactment'" . . . Nor may we " 'engage in conjecture or surmise which will circumvent the plain meaning of the act'" . . . Therefore, if the meaning of those words is clear, the analysis is complete and we need look no further.

\* \* \* \* \*

So too, "[a] regulation '[should] not be interpreted in a manner leading to absurd or unreasonable results.'"

Id. at 339-41 (citations omitted).[23]

_____

[23]  See also Fine v. Galloway Tp. Committee, 190 N.J. Super. 432, 441 (App. Div. 1983)("[R]ules and regulations of an administrative agency are subject to the same canons of construction as is a Statute."); State v. Butler, 89 N.J. 220, 226 (1982)("As a general rule of statutory construction, we look first to the language of the statute. If the statute is clear and unambiguous on its face and admits of only one interpretation, we need delve no deeper than the act's literal terms to divine the Legislature's intent"); Reisman v. Great Amer. Recreation, 266 N.J. Super. 87, 96 (App. Div. 1993)("It is beyond question that '[s]tatutes [should] not be interpreted in a manner leading to absurd or unreasonable results." (citation (footnote continued)

Bearing these principles in mind, an examination of the Policy and the Commission's interpretation of its provisions demonstrates that the Commission misinterpreted those provisions, interpreting them in a manner inconsistent with the Civil Service Act, and in a manner that violates the Equal Protection Clause of the 14th Amendment and Article 1, §1 of the New Jersey Constitution.

**A. Under The Express Terms Of N.J.A.C. 4A:7-3.2(n), Dr. Schuman Was Entitled To Appeal To The Commission.**

N.J.S.A. 18A:64-21.2 provides, in pertinent part that:

> Professional members of the academic, administrative and teaching staffs shall include all faculty positions, current professional positions listed as unclassified positions pursuant to Title 11, Civil Service, of the Revised Statutes and all professional positions currently listed as classified positions pursuant to Title 11 of the Revised Statutes, which are not presently included within any bargaining unit.

omitted)); Matter of N.J.A.C. 14A:20-11, 216 N.J. Super. 297, 306-07 (App. Div. 1987)("It is basic in the construction of legislation that every effort should be made to harmonize the law relating to the same subject matter. We conclude that this principle should be applied to the construction of regulations"); Lower Main v. N.J. Housing Mortg., 114 N.J. 226, 236 (1989)("[D]eference does not require abdication by the judiciary of its function to assure that agency rulemaking conforms with basic tenets of due process, and provides standards to guide both the regulators and the regulated"); Turnpike Authority v. AFSCME Council 73, 150 N.J. 331, 351 (1997)("[A]gencies 'have no superior ability to resolve purely legal questions,' and . . . courts are not bound by agency's resolution of legal issue[s][.]" (citation omitted)); Russo v. Bd. of Trustees, Police, 206 N.J. 14, 18 (2011)("[W]e are 'in no way bound by an agency's interpretation of a statute or its determination of a strictly legal issue[.]" (citation omitted)).

74

> All these positions shall be removed from the
> provisions of Title 11 of the Revised Statutes;
> however, any employee currently having classified
> status in a title shall have the option of retaining
> all the rights and privileges of a classified employee
> in that title for so long as the employee maintains
> uninterrupted service in, or is on an approved leave
> of absence from, that title.

10      As the Director indicated in his October 1, 2018, letter to
Appellant's counsel, Pa51, the above provision removed
professors, who are in the unclassified service, from coverage
under the Civil Service Act. Consequently, most of the appeal
provisions in the Administrative Code ("Code"), N.J.A.C. 4A:2-
2.1, et seq., which apply "only to permanent employees in the
career service or a person serving a working test period," i.e.,
employees in the classified service, may not be invoked by
employees in the unclassified service, such as professors
employed by New Jersey public universities.

20      There is an exception to the above, however, which the
Commission failed to recognize. As the Director noted, the
Policy, whose provisions are set forth in N.J.A.C. 4A:7-1.1, et
seq., applies to all New Jersey public employees, regardless
whether in the classified or unclassified service, to wit,
N.J.A.C. 4A:7-3.1(a)1: "Prohibited discrimination/harassment
undermines the integrity of the employment relationship,
compromises equal employment opportunity, debilitates morale,
and interferes with work productivity. Thus, this policy applies

to all employees and applicants for employment in State departments, commissions, State colleges or universities, agencies, and authorities." Thus, under the Policy, an employee in the classified service can file a complaint against an employee in the unclassified service alleging a violation of the Policy, and vice versa. Alternatively, as in the instant case, a professor in the unclassified service can charge another professor in the unclassified service with a violation of the Policy. Consequently, the scope of coverage of the Policy –
10 under which any State employee can be charged with a violation, regardless whether the employee is a professor in the unclassified service, or a custodian in the classified service – is broader than the scope of employees included in the Code's appeal procedures, which excludes professors who are not covered under the Civil Service Act.

In the initial letter of denial, the Director noted that, while the Policy applies to all State employees, the appeal provisions in the Policy are "limited to specific classes of employees." Pa52. In support of this assertion, he cited
20 N.J.A.C. 4A:7-3.2(m), which states: "A complainant who is in the career, unclassified or senior executive service, or who is an applicant for employment, who disagrees with the determination of the (State agency head or designee), may submit a written appeal within [twenty] 20 days of the receipt of the final

76

letter of determination ... to the Civil Service Commission"
(emphasis supplied). In the instant matter, the complainant was
Dr. Tracey, who is in the unclassified service.

The Director concluded that "as Dr. Schuman is serving in a
position not subject to Title 11A, the Civil Service Commission
does not have the jurisdiction to review her appeal of the Chief
of Staff's determination nor does it have the authority to
review this matter as a grievance. Accordingly, this matter will
not be forwarded to the Civil Service Commission for a
determination and we consider the matter closed." Pa52. The
Director's conclusion, however, ignored the provisions of
N.J.A.C. 4A:7-3.2(n), which states that "[i]n a case where a
violation has been substantiated, and no disciplinary action
recommended, the party(ies) against who the complaint was filed
may appeal the determination to the Civil Service Commission at
the address indicated in [subparagraph] (m)" (emphasis
supplied). The provision applies to "parties," which includes
all public employees who may be the subject of a Policy
violation charge, including professors. Since the final
determination in Ms. Kelly's August 27 letter did not include
any recommendation of disciplinary action against Appellant, by
its plain, unambiguous language, subparagraph (n) granted
Appellant a right of appeal to the Commission and the
Commission's jurisdiction was vested.

77

The Commission's assertion that it did not have jurisdiction to review the matter as a grievance is equally difficult to square with the position that the Commission lacked jurisdiction given the Director noted that, "N.J.A.C. 4A:2-3.1(f) provides that grievance procedures shall not be used to address any matter for which there is another specific type of appeal to the Commission." Pa51 (emphasis supplied). But N.J.A.C. 4A:7-3.2(n) is exactly such a provision, which does provide for an appeal to the Commission when no disciplinary action has been recommended in the final determination-as in this case. Therefore, if no appeal is available, a grievance would be appropriate, but the Commission rebuffed that avenue of recourse as well.

N.J.A.C. 4A:7-3.2(n) thus carves out an exception to the restriction in N.J.A.C. 4A:2-2.1 that the procedures only apply to employees in the classified service. It unequivocally provided that Appellant had a right to appeal the "final determination" to the Commission because that determination did not recommend discipline. The Commission's denial of jurisdiction was directly contrary to the unambiguous language of the Commission's own regulation. As the Court observed in Director, Office of Workers' Compensation Programs v. Mangifest, 826 F.2d 1318 (3d Cir. 1987):

> The Supreme Court has made clear that courts must defer to an agency's consistent interpretation of its own regulation unless it is "plainly erroneous or

inconsistent with the regulation."

* * * * *

[W]e defer to a policymaker's plausible explanation of the language in a regulation. That rule, however, does not permit the policymaker, in an adjudicatory proceeding, to imply language that simply does not exist:

The responsibility to promulgate clear and unambiguous standards is upon the Secretary. The test is not what he might possibly have intended, but what he said. If the language is faulty, the Secretary has the means and the obligation to amend.

* * * * *

Furthermore, we have in the past differentiated between a reasoned interpretation of a regulation's language and a mere position about what the regulations require. ... Although we must defer to an agency regulation that is not "plainly erroneous," we must understand how the agency connects its position to the language of the regulation in order to evaluate its plausibility. If we cannot understand the agency's reasoning, if it is self-contradictory, or if it is ambiguous, we cannot defer to it. (Citations and footnotes omitted.)

Id. at 1324.

By disregarding the unambiguous language in N.J.A.C. 4A:7-3.2(n), the Commission also ignored the terms of the Civil Service Act, which provides, "[t]he State unclassified service shall not be subject to the provisions of this title unless otherwise specified." N.J.S.A. 11A:3-4 (emphasis supplied). N.J.A.C. 4A:7-3.2(n) unambiguously does otherwise specify.

This Court has actually addressed this very issue in a prior case in a comparable context. In In re Hearn, 417 N.J. Super.

79

289 (App. Div. 2010), the appellant had been employed as a
certified public accountant the Dept. of Education, which was an
unclassified position. A subordinate employee accused him of
violating the Policy by engaging in racial discrimination. He
was demoted from his position as Manager 1 in the unclassified
service to Planning Associate 1, a position in the non-
competitive division of the career service. He appealed his
demotion to the Merit System Board ("Board"). After a hearing,
the ALJ determined that the charge of racial discrimination was
unsubstantiated and ordered that he be restored to his original
position, with back pay, and be awarded attorney fees. The Board
adopted the ALJ's findings and recommendations with the
exception of the award of back pay and attorney fees.

   Hearn filed an appeal contesting the denial of back-pay in
this Court, which reversed the Board's decision noting that:

> The Board responds that . . . N.J.A.C. 4A:2-2.1(a)
> limits "[t]his subchapter . . . only to permanent
> employees in the career service or a person serving a
> working test period." According to the Board,
> N.J.A.C. 4A:2-2.3(a)(9) and -2.a2(a) apply only to
> classified employees because those regulations are
> within subchapter 2, and Hearn was an unclassified
> employee in his position as Manager 1, Education.
> * * * * *
>
> We conclude, however, that the Board erred as a matter
> of law in failing to apply correctly the procedural
> provisions of chapter 7 of the regulations, which
> apply to the State anti-discrimination policy.
>
> * * * * *
> Subsection (n) of [N.J.A.C. 4A:7-3.2] . . . authorizes

80

FILED, Clerk of the Appellate Division, November 18, 2019, A-002540-18, AMENDED

an appeal to the Commission by an employee who has
been found to have violated the anti-discrimination
policy. A provision of subsection (n) states: "If
disciplinary action has been recommended in the final
letter of determination, the party(ies) charged may
appeal using the procedures set forth in N.J.A.C.
4A:2-2 and 3." N.J.A.C. 4A:7-3.2(n)(3). Thus, by
regulation, the procedures applicable to
discrimination appeals involving disciplinary action
10    are the same as those applicable to disciplinary
action brought under chapter 2, subchapter 2, against
permanent employees in the career service. Because
demotion is considered a major disciplinary action
under N.J.A.C. 4A:2-2.2(a), Hearn's appeal required
application of the procedural rules contained in
N.J.A.C. 4A:2-2.

The Board and the DOE argue that N.J.A.C. 4A:7-3.2(n)
is only applicable to employees in the career service.
20    We disagree.

The use of the terms "party(ies)" in subsection (n)
evinces no intent to limit the right of appeal to
employees in the career service. If we were to limit
application of subsection (n) as the Board and the DOE
contend, the anti-discrimination policy itself,
N.J.A.C. 4A:7-3.1, would not apply to Hearn because he
was not in the career service. Yet that policy
clearly applied to Hearn. N.J.A.C. 4A:7-3.1(k) refers
30    to action that may be taken against "[a]ny employee
found to have violated any portion or portions of this
policy." Just as any State employee must adhere to the
anti-discrimination policy, any State employee has a
right to appeal disciplinary action taken because of
an adverse finding that he has violated the policy.
Indeed, the Board acknowledged Hearn's right of appeal
under the predecessor regulation although he was not a
classified, career service employee.

40    We also reject the argument that subsection (n) covers
a smaller set of State employees in comparison to
subsection (m) of N.J.A.C. 4A:7-3.2, which pertains to
an appeal of the agency's decision by a person who has
complained of discrimination. Subsection (m) applies
to "[a] complainant who is in the career, unclassified
or senior executive service, or who is an applicant
for employment" while subsection (n) applies to

81

"party(ies)" charged discrimination. (Emphasis supplied.)

Id. at 299-302.

The ruling in Hearn applies with equal force to the right of appeal of a party who is an unclassified employee who has been held to have violated the Policy, but against whom the final determination does not issue any disciplinary action. Appellant was entitled to appeal the determination that she had violated the Policy to the Commission. The Commission's rejection of the appeal on the erroneous ground that it did not have jurisdiction was, as held in Hearn, 417 N.J. Super at 308, "arbitrary, capricious and unreasonable," and must be overturned.[24]

10

---

[24] If the Court rejects Appellant's argument in Point I that the Policy is unconstitutional, the case must be remanded to the Commission for an evidentiary hearing. If the Court agrees that Dr. Schuman's due process rights were violated by the imposition of discipline contained in Dr. Toney's letter of January 14, and Ms. Peter's letter of January 15, then Dr. Schuman is entitled to a hearing pursuant to N.J.A.C. 4A:7-3.2(n), since no discipline will have been imposed, but she would still be entitled to an evidentiary hearing to determine if she actually violated the Policy. If the Court rejects Appellant's argument that her due process rights were violated, and imposition of the disciplinary action was legitimate if she violated the Policy, then the case must be remanded to the Commission for an evidentiary hearing pursuant to N.J.A.C. 4A:7-3.2(n)(3), since under the Court's holding in Hearn, supra, even unclassified employees, including unclassified employees such as professors who have been removed from Civil Service coverage under Title 11, are entitled to an evidentiary hearing in accordance with N.J.A.C. 4A:2.2 and 3.

FILED, Clerk of the Appellate Division, November 18, 2019, A-002540-18, AMENDED

**B.  The Determination The Commission Did Not Have Jurisdiction To Hear The Appeal Violated Equal Protection.**

As a State agency, the Commission is obviously governed by the provisions of the United States Constitution. The Commission's interpretation of its regulations in the Policy creates anomalies that violate the Equal Protection Clause of the 14th Amendment. For example, if, accepting the Commission's position, arguendo, that professors are not classified employees and therefore are not entitled to use the Commission's appeal procedures if he or she is found to have violated the Policy, that same professor would have a right of appeal if he or she filed a discrimination charge against, for example, an employee in the classified service, and the decision was adverse to her as the complainant. If, on the other hand, a clerical or custodian filed a discrimination charge against a professor for using an ethnic, racist or religious slur against the employee, for example, and the professor lost, the professor would not have a right of appeal to the Commission. Assuming the professor is tenured, only if the charge were sustained and the discipline imposed was dismissal or reduction in pay would the tenured professor have a right of appeal under the New Jersey Teachers Tenure Act, N.J.S.A. 18A:6-18. The clerical/custodian, by contrast, would have a right of appeal regardless the severity of the discipline.

83

This disparity in appellate rights violates the Equal
Protection Clause. The standard by which the constitutionality
of such disparities is evaluated was stated in Cleburne v.
Cleburne Living Center, Inc., 473 U.S. 432 (1985):

> The Equal Protection Clause of the Fourteenth
> Amendment commands that no State shall "deny to any
> person within its jurisdiction the equal protection of
> the laws," which is essentially a direction that all
> persons similarly situated should be treated alike . .
> . The general rule is that legislation is presumed to
> be valid and will be sustained if the classification
> drawn by the statute is rationally related to a
> legitimate state interest.

> Id. at 439-440 (citations omitted).[25]

In Lindsey v. Normet, 405 U.S. 56 (1972), the Supreme Court
overturned a requirement that tenants challenging an eviction
notice, in addition to filing an undertaking with one or more
sureties covering all damages, costs and disbursements which may
be awarded against the tenant on appeal, were also required to
post a prohibitive surety bond for twice the rental value of the
premises during the pendency of the appeal, holding that:

> This Court has recognized that if a full and fair
> trial on the merits is provided, the Due Process
> Clause of the Fourteenth Amendment does not require a

---

[25] See also Arsenault v. Gavin, 248 F.2d 777, 789-90 (1st Cir.
1957)("[I]n order to make out a case of denial of equal
protection of the laws it must be shown that the administrative
agency has made 'a purposeful discrimination against one person
and in favor of another person in like case, with no rational
basis for a differentiation between the two'" (Citation
omitted)).

State to provide appellate review . . . <u>When an appeal
is afforded, however, it cannot be granted to some
litigants and capriciously or arbitrarily denied to
others without violating the Equal Protection Clause</u>.

\* \* \* \* \*

The claim that the double-bond requirement operates to
screen out frivolous appeals is unpersuasive, for it
not only bars nonfrivolous appeals by those who are
unable to post the bond but also allows meritless
appeals by others who can afford the bond. The impact
on FED appellants is unavoidable: if the lower court
decision is affirmed, the entire double bond is
forfeited; recovery is not limited to cost incurred by
the appellee, rent owed, or damage suffered. No other
appellant is subject to automatic assessment of
unproved damages. We discern nothing in the special
purposes of the FED statue or in the special
characteristics of the landlord-tenant relationship to
warrant this discrimination. (Emphasis supplied,
citations omitted.)

<u>Id</u>. at 77.[26]

Likewise, the Commission's rejection of Appellant's appeal

---

[26]  <u>See also</u> <u>Rinaldi v. Yeager</u>, 384 U.S. 305, 308 (1977)(New
Jersey statute which required that certain prisoners repay the
government for the cost of a transcript required for their
appeal "fastens the duty of repayment only upon a single class
of unsuccessful appellants – those who are confined in
institutions. We find that the discriminatory classification
imposed by this law violates the requirements of the Equal
Protection Clause); <u>Griffin v. Illinois</u>, 351 U.S. 12, 18
(1956)(Illinois statute which provided a free transcript to
indigent prisoners sentenced to death, but required other
prisoners to pre-pay for the transcript as a condition of appeal
"effectively denies the poor an adequate appellate review
accorded to all who have money enough to pay the costs in
advance . . . . Appellate review has now become an integral part
of the Illinois trial system for finally adjudicating the guilt
or innocence of a defendant. Consequently at all stages of the
proceedings the Due Process and Equal Protection Clauses protect
persons like petitioners from invidious discrimination."
(Citations omitted).

FILED, Clerk of the Appellate Division, November 18, 2019, A-002540-18, AMENDED

violated Article 1, §1 of the New Jersey Constitution. Although the provision does not utilize the words "equal protection," New Jersey courts have repeatedly held that the principle of equal protection is implicit in its declaration. See, e.g., Peper v. Princeton Univ. of Bd. of Trustees, 75 N.J. 55 (1978). In accord with the principles of federalism, New Jersey courts have recognized that the scope of equal protection under the N.J. Constitution can be broader than that afforded by the 14th Amendment. See Robinson v. Cahill, 62 N.J. 473 (1973) (unlike the 14th Amendment as interpreted by the U.S. Supreme Court in San Antonio Independent School District v. Rodriquez, 411 U.S. 1 (1973), wherein the Court held that the disparities in the funding of public schools based on the disparities in property values in different school districts, did not offend the 14th Amendment, such disparities did violate the equal protection dimension of Article 1, §1).[27]

Since the scope of equal protection under the New Jersey Constitution is at least as broad as that of the 14th Amendment,

---

[27] See also Lewis v. Harris, 188 N.J. 415, 463 (2006)("To comply with the equal protection guarantee of Article 1, Paragraph 1 of the New Jersey Constitution, the State must provide to committed same-sex couples, on equal terms, the full rights and benefits enjoyed by heterosexual married couples."); Right to Choose v. Byrne, 91 N.J. 287, 301 (1982)("[T]his Court has recognized that our state Constitution may provide greater protection than the federal Constitution.")

the disparate appeal rights afforded to employees in the
classified and unclassified service under the Policy, as
interpreted by the Commission, violates both constitutions.
There is no rational explanation why, for example, a clerical or
custodian employed by Kean University deemed to have violated
the Policy and deserving of disciplinary action less than
dismissal or reduction in pay, e.g., a 20-day suspension, or a
written reprimand, is entitled to appeal the decision to the
Commission, but Dr. Schuman, a tenured professor with a Ph.D.,
10   who has been teaching at Kean for over 50 years, can be subject
to comparable disciplinary action, but be denied the right to
appeal to the Commission, or be afforded an equally convenient
alternative. This is not to suggest that Dr. Schuman, by virtue
of her education, enjoys a status that entitles her to superior
rights as compared to clericals or custodians; by the same
token, however, employees in the classified service are not
entitled to superior appellate rights as compared to employees
in the unclassified service.

By way of example, in In the Matter of J.L., 2016 WL
20   512431(App. Div. Feb. 10, 2016), J.L. was employed as a
groundskeeper by Kean University.[28] Two of his co-workers alleged
he had made derogatory remarks regarding their national origin.

---

[28]  In accordance with R. 1:36-3, a copy of the unpublished
decision is included in the Appendix. Pa84.

He was charged with violating the Policy and was required to undergo remedial training. He appealed to the Commission, which reviewed the written record and denied his appeal. J.L then appealed to this Court, which reversed, holding that:

> [T]here are plainly disputed material facts: Kean contends J.L. made inappropriate comments to co-workers and acted unprofessionally, but J.L. denies making the comments or engaging in the alleged action. The plain language of N.J.A.C. 4A:2-1.1(d) requires a hearing in such circumstances. The resolution of the material disputes between J.L. and the witnesses largely turns on their credibility. Such credibility determinations, in turn, can only be assessed by a fact-finder making first-hand observations and evaluations of the witnesses.
>
> * * * * *
>
> Here, the Commission's reliance on the written record was a mistaken exercise of discretion. The Commission was not presented with definitive findings; it only had a secondhand report. Moreover, this was not a situation where J.L. was merely denying evidence so undeniable that the Commission "would have had to ignore reality" to credit J.L.'s denial. ... Instead, this was a situation that required a hearing and the denial of J.L.'s request for a hearing was an abuse of discretion.

Id. at *3 (citations omitted).

Although the contents of the email which Dr. Schuman sent to Dr. Tracey are not subject to dispute, Dr. Schuman does dispute the claim in the "final determination" letter that she made "comments . . . related to [a] student's name, accent, and manner of speaking English." Pa59. Moreover, until the Attorney General produced all of the students' written statements during

88

the week of September 30, 2019, the substance of the students'
allegations was unknown to Appellant and she has never had an
opportunity to defend herself in an evidentiary hearing.[29]

If the Policy applies to <u>all</u> State employees, groundskeeper,
secretary or tenured professor, due process requires they have
equal access to remedies afforded under the Policy. There is no
rational explanation-consistent with due process and equal
protection-that justifies treating Appellant differently than
J.L., by affording J.L. greater due process and appellate rights

---

[29] It deserves noting that all of the students' statements
constitute inadmissible hearsay under <u>N.J.R.E.</u> 801, and may not
be relied on to prove the truth of the matters asserted therein.
<u>See</u>, <u>e.g.</u>, <u>Konop v. Rosen</u>, 425 N.J. Super. 391, 404-06 (App.
Div. 2012) ("hearsay within hearsay inadmissible); <u>Matter of
Wolf</u>, 231 N.J. Super 365, 376 (App. Div. 1989) ("[O]ne who can
suffer the loss of his tenured employment should at the very
least have the opportunity to confront his accusers, unless a
court has made the specific findings required by <u>N.J.S.A.</u>
2A:84A-32.4b, after the presentation of sufficient evidence to
warrant such a determination."); <u>Constantino v. New Jersey Merit
Syst. Bd. & Division of Motor Vehicles</u>, 313 N.J. Super 212, 220
(App. Div. 1998) ("We find it inexplicable and intolerable that
an unsworn extra-judicial statement made by a trial witness
could have been characterized by the finder of fact as
testimony.") Aside from the email to Dr. Tracey, which Dr.
Schuman has acknowledged sending, Mr. Williams' Investigation
Report, upon which the University made the determination that
Dr. Schuman had violated the Policy, was based entirely on
conversations with, and written statements by, students, who
were not examined under oath, and whose statements clearly
constitute inadmissible hearsay. Mr. Williams' Investigation
Report, included in the University's certified record,
consequently is itself hearsay, constituting hearsay within
hearsay, and is inadmissible. <u>Konop</u>, <u>supra</u>.

than Appellant.[30] Dr. Schuman is entitled to an appeal as of right from the ruling that she violated the Policy to <u>some</u> forum, either to the Commission or to this Court. Failure to afford her such an appeal, and ultimately an evidentiary hearing to develop a full record, would violate the Equal Protection Clause and Article 1, §1 of the N.J. Constitution.

### POINT IV

10 **IN THE INTEREST OF JUDICIAL ECONOMY, THE COURT SHOULD ASSERT ORIGINAL JURISDICTION OVER THIS APPEAL PURSUANT TO <u>R</u>. 2:10-5. (This issue was not addressed below.)**

Under the arguments presented in Point III, the Court could

---

[30] Similarly, in <u>In the Matter of T.M.</u>, 2013 WL 2301090 (App. Div. May 28, 2013) (unpublished), Pa97, T.M. was employed by the Department of Education. His duties included implementing measures to improve educational opportunities for urban youth. Two female co-workers accused him of making a lewd remark in their presence. He was charged with violating the Policy. The charge was sustained by the Department and T.M. was ordered to write a letter of apology to the co-workers and required to undergo counseling regarding the Policy.

T.M. filed an appeal with the Commission, which concluded that the remark, the intent of which was ambiguous, was inappropriate and rejected his appeal. On appeal, this Court concluded that the Commission had failed to comply with <u>N.J.A.C.</u> 4A:2-1.1(d), and observed that "we can have little confidence in the decisions of state agencies if they do not follow their own rules." Pa77. The Court held that given the disputed character of what T.M. actually said, and what he meant, under the plain language of <u>N.J.A.C.</u> 4A:2-1.1(d), "a 'material and controlling dispute of facts exists that can only be resolved by a hearing' militates inexorably in favor of a hearing." Appellant, notwithstanding that she is in the unclassified service, is entitled under the Equal Protection Clause, and the comparable principle under Article 1, §1 of the New Jersey Constitution, to the same opportunity to defend herself.

reverse the Commission's decision denying jurisdiction over Appellant's appeal and order the Commission to assign the appeal to an Administrative Law Judge for an evidentiary hearing. In that hearing, Appellant would assert the demonstrated facial unconstitutionality of the Policy as a complete defense – she cannot be held to have violated a Policy which is pervasively unconstitutional and unsalvageable. As demonstrated above, the Policy is also unconstitutional as applied to Appellant here.

The Commission will either accept or reject this argument. If it accepts the argument, that will be the end of the matter, pending an appeal, if any, by the Respondent, in which case Appellant is confident that this Court will affirm the Commission on appeal. If the Commission rejects the argument, Appellant will, in due course, appeal that decision to this Court, in which case she is confident that the Court will sustain the argument that the Policy is irredeemably unconstitutional and reverse the Commission's decision. Alternatively, although Dr. Schuman would have an obligation to raise her constitutional arguments before the Commission in order to preserve them, since the Commission could refrain from deciding the constitutional question on the basis that it does not have jurisdiction to address constitutional claims, it could only note their being raised, in which case they would still have to be addressed on appeal to this Court. See Patterson

Redevelopment Agency v. Schulman, 78 N.J. 378, 388 (1979)("We  .

. . conclude that relocation claims must first be presented to

the local agency. Because that agency lacks proper jurisdiction

to decide constitutional claims, such issues should merely be

noted, as is generally done in the municipal court.")[31]

Dr. Schuman respectfully submits that, in light of the above,

it would be an inefficient use of judicial resources to remand

this matter to the Commission for an evidentiary hearing.

Appellant instead respectfully submits that this court should

10    assert original jurisdiction over the issues raised in this

consolidated appeal, pursuant to R. 2:10-5, invalidate the

Policy in its entirety on the basis that it is facially

unconstitutional, overrule Kean's decision that Dr. Schuman

violated the Policy, and reverse and/or expunge the disciplinary

actions that were imposed on her for the purported violation of

---

[31] See also Abrahams v. Civil Serv. Comm., 65 N.J. 61
(1974)(Commission hearing officer ruled he could not decide
constitutional issue relating to city's residency requirement);
Coursey v. City of Atl. City, 2013 WL 5676851, *7 (App. Div.
Oct. 21, 2013), Pa96, ("[A]lthough the [Civil Service]
Commission was authorized to resolve whether Coursey was
entitled to special reemployment rights that would have
prohibited his termination . . . the Commission was not
authorized to resolve his constitutional, contractual, tort, and
common-law claims . . . as these claims required the development
of a fuller record and fact-finding in the Superior Court.")

the Policy.[32]

The leading case dealing with the assertion of original
jurisdiction over a legal proceeding by the Appellate Division
is Maisonet v. New Jersey Department of Human Services, Div. of
Family Development, 140 N.J. 214 (N.J. 1995). In Maisonet, the
plaintiff contested a determination by the Passaic County Board
of Social Services that she was disqualified from receiving food
stamps for six months because she had failed to report as income
a reduction in her apartment rent, extended to her in exchange

---

[32] It is important to note that Appellant's only option in this
matter has been to file an appeal in this court. Given the
directive in N.J.A.C. 4A:7-3.2(n) that an appeal of Kean's
"final determination" of a Policy violation, without
disciplinary action, was to be filed with the Commission,
failure to follow that directive and using an alternative venue,
e.g., the Superior Court Law Division, would have subjected her
to the charge that she had failed to exhaust her administrative
remedies. See Patterson Redevelopment, supra, 78 N.J. at 386-87.
Having commenced the appeal procedure before the Commission,
when the Commission denied jurisdiction (incorrectly), Dr.
Schuman could not file an action in the Law Division, since
under R. 2:2-3(a)(2), the Appellate Division has exclusive
jurisdiction over appeals of final agency decisions. Mutschler
v. New Jersey Dept. of Environmental Protection, 337 N.J. Super.
1, 9 (App. Div. 2001); Beaver v. Magellan Health Servs., Inc.,
433 N.J. Super. 430 (App. Div. 2013). Mr. Myers' Jan. 2, 2019,
letter was clearly a final agency decision, since he concluded
the letter stating, "[T]his matter will not be forwarded to the
Civil Service Commission for a determination and we consider the
matter closed." See Silviera-Francisco v. Bd. of Educ. of
Elizabeth, 224 N.J. 126, 137 (2016)("A final agency decision has
also been described as one in which the agency communicates with
'unmistakable written notice the finality' of its decision."
Consequently, Appellant's only viable option to contest the
actions of the Commission and Kean, and to have her
constitutional rights vindicated, was to commence an appeal in
this court.

FILED, Clerk of the Appellate Division, November 18, 2019, A-002540-18, AMENDED

for janitorial services she performed for her landlord. When the Director of the Division of Family Development reversed the finding that Maisonet had intentionally concealed the rent reduction, but affirmed that the reduction constituted reportable income, Maisonet filed an appeal with the Appellate Division. In that appeal she raised a claim under 42 U.S.C. § 1983, and requested, for the first time, that she be compensated attorney fees pursuant to 42 U.S.C. § 1988. The Appellate Division refused to assert original jurisdiction over the

10   attorney fee claim. On appeal to the Supreme Court, Maisonet argued that this court was required to assert original jurisdiction over the § 1988 attorney fee claim pursuant to the Supremacy Clause in Article VI of the U.S. Constitution.

The Supreme Court held the Appellate Division had lawfully exercised its discretion not to exercise original jurisdiction over the federal attorney fee claim. In order to provide future guidance regarding asserting or declining original jurisdiction, however, the Court proceeded to set forth the following guidelines:

20       As a matter of policy, we deem it appropriate that a
         review of a final administrative decision of a State
         agency by the Appellate Division pursuant to *Rule* 2:2-
         3(a)(20) ordinarily should be limited to scrutiny of
         the decision of the administrative body. Consistent
         with that policy, if an aggrieved party in an
         administrative matter elects not to file a complaint
         in the Law Division alleging claims under sections
         1983 and 1988, but instead raises federal claims in

94

the notice of appeal or cross-appeal, unless the
Appellate Division decides to exercise original
jurisdiction, the following procedure should be
followed:

1) The notice of appeal or cross-appeal insofar as the
federal claims are concerned shall be deemed a
complaint under *Rule* 4:2-2 and shall toll the running
of any statute of limitations.

10

2) Venue shall be laid in the county in which the
cause of action arose.

3) The Appellate Division shall transfer the federal
claims, pursuant to *Rule* 1:13-4, to the Law Division
by filing with the Deputy Clerk of the Superior Court
"in the county in which the cause of action arose." R.
4:3-2(a)(2). A different venue may be selected in
accordance with *Rule* 4:3-2(c) when warranted by
20      special circumstances.

4) *Rule* 4:9-1 shall control amendments to the special
complaint carved out of the notice of appeal or cross-
appeal transfer.

5) The Law Division, by virtue of the transfer, shall
have the power to award section 1988 attorney's fees
for services rendered in the Appellate Division if
they are found appropriate.

30

Although the procedure we now adopt <u>does not deprive
the Appellate Division of its discretion under *Rule*
2:10-5</u>, that procedure contemplates that federal
claims arising out of decisions rendered by state and
local administrative agencies ordinarily will be heard
in the Law Division.

<u>Id</u>. at 226-27 (emphasis supplied).[33]

---

[33]   <u>See also</u> <u>Matter of Judges of Passaic County</u>, 100 N.J. 352,
359 (1985)("We have always stressed the quest for principles of
law 'designed to assure that a controversy, or its most critical
facets, will be resolved by the forum or body which, on a
comparative scale, is in the best position by virtue of its
statutory status, administrative competence and regulatory
expertise to adjudicate the matter'"); <u>Christian Bros. Inst. v.</u>
(footnote continued)

FILED, Clerk of the Appellate Division, November 18, 2019, A-002540-18, AMENDED

As noted in <u>Maisonet</u>, this court, notwithstanding the guidelines, has the authority under <u>R</u>. 2:10-5 to exercise its discretion and assert original jurisdiction over an appropriate case. Appellant respectfully submits that this is such a case. Given the numerous case precedents cited in the argument set forth in Point I, it is beyond meaningful dispute that the Policy is facially unconstitutional. The very basis for Appellant seeking review of the University's "final determination" that she had violated the Policy was to contest that ruling. She never had the opportunity to raise her constitutional argument before the Commission, because the Director denied jurisdiction. A holding that the Policy is

10

_____

No. N.J. Interschol. League, 86 N.J. 409, 418-19 (1981)("The proper procedure was to raise these [constitutional] claims before the Appellate Division upon appeal from an adverse decision of the Division on Civil Rights. Although it would have been preferable for plaintiff to note its constitutional claims in its complaint before the Division [on Civil Rights], ... the Division [on Civil Rights] did not have the power to resolve these claims. Administrative agencies have power to pass on constitutional issues only where relevant and necessary to the resolution of a question concededly within their jurisdiction." Citation omitted.); Minter v. Bendix Aviation Corp., 24 N.J. 128, 130 (1957)("Our rules provide ample opportunity for appellate courts to exercise superintending control over litigation which has an occasional tendency to spread itself over an undue length of time and provokes an unnecessary usurpation of judicial manpower with its accompanying expense to litigants."); State v. Rose, 173 N.J. super. 478, 483 (App. Div. 1980)("Resort to the authority to exercise our original jurisdiction is particularly appropriate here where there is an emergent matter implicating the public interest.")

unconstitutional – a holding that, Appellant submits is unavoidable – resolves her appeal with finality. There is no point in remanding the matter to the Commission, since it does not have jurisdiction to evaluate the constitutionality of the very Policy it promulgated. Nor is there any point in remanding the question of the Policy's constitutionality to the Trial Division, since the conclusion the Policy is pervasively unconstitutional and unsalvageable is unavoidable. The Appellate Division is "the forum ... which, on a comparative scale, is in

10 the best position by virtue of its statutory status, administrative competence and regulatory expertise to adjudicate the matter" and render the holding that the Policy is unconstitutional and hereafter unenforceable.

Moreover, as stated in <u>Rose</u>, <u>supra</u>, a resolution of the Policy's unconstitutionality is exigent and of public interest. Public employees in New Jersey, like Appellant and others are being wrongfully charged with violating an unconstitutional policy and subjected to unconstitutional disciplinary actions. This court should step in to put an end to this unconstitutional

20 application of administrative authority and to the coercive use of an unconstitutional policy to infringe on the 1st Amendment rights of New Jersey's public employees.

## <u>CONCLUSION</u>

For the foregoing reasons this court should assert original

jurisdiction over this litigation; declare that the New Jersey Policy Prohibiting Discrimination In The Workplace unconstitutional and therefore abrogated; overturn Kean University's determination that Dr. Schuman violated the unconstitutional Policy; and rescind and expunge the disciplinary actions imposed on Dr. Schuman for her purported violation of the Policy.

In the alternative, if the Court declines to assert original jurisdiction, it should remand this matter to the Commission for an evidentiary hearing. If the court does assert original jurisdiction, Appellant requests that the court remand this matter to the Law Division for adjudication of her claims against Kean University for violating her constitutional rights and of any additional statutory and common law claims that are deemed appropriate and supported by law.

Respectfully submitted,

WILLIAMS CEDAR LLC

BY: _/s/ Kevin Haverty_
KEVIN HAVERTY

DATED:   November 18, 2019